# APPENDIX B

# Declaration of John Kanas

In Support of Motion of Defendants
Kanas and Bohlsen for Summary Judgment

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

Capital One Financial Corporation, )
)
    Plaintiff, )
)
v. )   Civil No. 1:11-CV-750 (LO/TRJ)
)
John A. Kanas and John Bohlsen, )
)
    Defendants. )
)

## DECLARATION OF DEFENDANT JOHN A. KANAS IN SUPPORT OF MOTION OF DEFENDANTS KANAS AND BOHLSEN FOR SUMMARY JUDGMENT

I, John A. Kanas, declare as follows:

1. I am over the age of 18 and make the statements set forth herein based on my own personal knowledge. I respectfully submit this Declaration in support of the Motion of Defendants Kanas and Bohlsen for Summary Judgment, filed with this Court on April 6, 2012. I am a Defendant in this suit, which was filed by Capital One Financial Corporation ("Capital One").

2. I am the Chairman of the Board and Chief Executive Officer of BankUnited, Inc., a publicly traded Delaware corporation ("BankUnited, Inc.").

3. Bank United, Inc. is the holding company for BankUnited, N.A. ("BankUnited"). BankUnited is a federally chartered institution that is classified as a Florida bank by the Federal Deposit Insurance Corporation ("FDIC"). The FDIC was the receiver for BankUnited Federal Savings Bank ("BankUnited, FSB"), certain assets of which were purchased and certain liabilities of which were assumed by BankUnited in a transaction with the FDIC (which had become the receiver of the insolvent BankUnited, FSB) in May 2009.

1

4.  I began my career in banking as a management trainee with North Fork Bank in 1971. At the time, North Fork Bank was a small bank with approximately 50 to 60 employees and a balance sheet of probably less than $200 million. In 1976, during a period of financial difficulty for the bank, the board of directors asked me to operate the bank as executive vice president while the board searched for a new president. In 1977, I became the president and chief executive officer of North Fork Bank. In 1980, I became president and chief executive office of North Fork Bancorporation, Inc. ("North Fork"), a bank holding company incorporated in Delaware in 1980 that owned North Fork Bank.

5.  I remained the senior-most banking executive at North Fork and North Fork Bank through 2006. At that time, North Fork Bank offered banking products and services to both commercial and consumer clients through a network of over 350 branches centered in the New York metropolitan area but extending to various locations in New York and New Jersey, and another subsidiary of North Fork maintained a single branch in Connecticut. Through its branches North Fork Bank offered commercial real estate loans, multi-family mortgages, construction and land development loans, asset based lending services, lease financing, business credit services, and commercial and consumer deposit services.

6.  On March 12, 2006, I executed a Restricted Share Agreement ("RSA") with Capital One that was contingent on a merger between Capital One and North Fork and the transfer of my interests in North Fork to Capital One. The agreement attached to the First Amended Complaint as Exhibit A is a true and accurate copy of the RSA I executed.

7.  On December 1, 2006, Capital One acquired North Fork in a stock and cash transaction valued at approximately $13.2 billion. As of the merger, I was President, Chief

Executive Officer, and Chairman of the Board of Directors of North Fork, and I had held the position of President of North Fork Bank for approximately 28 years.

8. As of the record date for the 2006 acquisition, and as reported in the Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 (July 11, 2006) at 116-117, I held less than 1% (4,302,126 shares) of North Fork's total outstanding shares.

9. When the Capital One merger closed in December 2006, I became a Capital One employee.

10. In July 2007, Capital One and I agreed to end our employment relationship. At the time, I was President of Capital One's Banking Segment.

11. On July 9, 2007, Capital One and I entered into a Separation and Transition Advisory Services Agreement (Ex. 1, the "Separation Agreement"). The agreement attached to the First Amended Complaint as Exhibit C is a true and accurate copy of the Separation Agreement I executed.

12. The Separation Agreement superseded the RSA. The RSA provided that, upon the meeting of certain contingencies, I would receive additional compensation in the form of restricted shares of Capital One common stock in December 2009. As part of the Separation Agreement, Capital One agreed that I did not need to work for Capital One until December 2009 (for three years) for my restricted shares to vest. Thus, under the Separation Agreement, the restricted shares of Capital One common stock vested on August 6, 2007, the date on which my employment with Capital One ended, rather than in December 2009. (Ex. 1 ¶ 2.) The non-competition provisions of the RSA also were superseded by those in the Separation Agreement.

13. In April 2009, I, along with investors that included several private equity funds formed BankUnited, Inc. BankUnited, Inc. became the parent company of BankUnited, which

3

was granted a savings association charter in May 2009 through the FDIC acquisition of assets of BankUnited, FSB. BankUnited, Inc. became a public company on January 27, 2011. BankUnited, Inc. has two wholly-owned subsidiaries: BankUnited and BankUnited Investment Services.

14. I am the Chairman of the Board and Chief Executive Officer (CEO) of BankUnited, Inc. Since May 2009, I have served as President and CEO of BankUnited. On May 19, 2010, I was affirmed as Chairman of the Board of Directors of BankUnited.

15. With respect to stock ownership, I own less than six percent of the stock of BankUnited, Inc.

16. BankUnited is classified by the FDIC as a Florida bank, and all of its branches are located in Florida. Capital One has no branches anywhere in Florida.

17. In May 2009, BankUnited acquired from the FDIC a total of ▮ mortgage loans with an outstanding balance of about ▮ that were secured by mortgages on real property in New York, New Jersey, or Connecticut (the "Tri-State Area"). This was approximately ▮ in value of the total mortgage loan portfolio acquired from the FDIC. I have had no personal involvement with these acquired loans.

18. BankUnited has also acquired on the secondary market a portfolio of ▮ real estate loans, ▮ of which, with an outstanding balance of about ▮, were secured by mortgages on real property in the Tri-State Area. BankUnited did not originate these loans. I have had no personal involvement with these loans.

19. BankUnited, like most banks around the country, accepts deposits from customers residing in the Tri-State Area. As of December 2011, ▮ of the total amount in deposit

4

accounts at BankUnited's Florida branches were held by customers who listed a primary address in the Tri-State Area. I have had no personal involvement with these deposit accounts.

20. In October 2010, BankUnited, Inc. formed a subsidiary, United Capital Business Lending, Inc. ("United Capital") which then acquired certain of the assets of a company located in Maryland that engaged in making equipment loans to franchisees across the United States. In December 2010, United Capital had outstanding loans totaling about ███████ Of this total, ███████ were secured by equipment located in the Tri-State Area. United Capital is run by its President, Bernard Lajeunesse, who reports to Mr. Bohlsen, who sits on United Capital's board of directors. I am not a member of the United Capital board.

21. In June 2011, BankUnited, Inc. and Herald National Bank ("Herald National") entered into an agreement under which BankUnited, Inc. would acquire 100% of the stock of Herald National through a merger. The transaction closed in February 2012, after it received approval from the Federal Reserve Bank of Atlanta and the Office of the Comptroller of the Currency.

22. Herald National is a commercial bank with three offices, all in New York. On a consolidated pro forma basis, the assets of Herald National represent approximately five percent of the combined assets of BankUnited, Inc. and its subsidiaries.

23. Based on the advice of the law firm Skadden Arps Slate Meagher & Flom, BankUnited, Inc. implemented a ring-fencing structure for the operation of Herald National that was consistent with the "not providing services" exception in the Separation Agreements (the "Ring-Fencing"). *See* Ex. 1, Annex B at 10.

24. The non-compete covenants in the Separation Agreement and the proposed Ring-Fencing were fully disclosed to the regulators, including the Federal Reserve Bank of Atlanta

and the Office of the Comptroller of the Currency, during the approval process and prior to regulatory approval of the Herald National acquisition. The transaction was approved without any objection by the regulators to the Ring-Fencing.

25.     The Ring-Fencing provides that, at least until the non-competes expire in August 2012, I will be "fenced out" of providing services to Herald National. Until then, Herald National will remain a separate entity and will not be merged into BankUnited, neither Mr. Bohlsen nor I will not have any decision-making authority or otherwise participate in the affairs of Herald National, the Herald National board will not report to either of us, and Mr. Bohlsen and I will recuse ourselves if any Herald National matter comes before the board of BankUnited, Inc. (Ex. 2, Ring Fence Memorandum, Annex 1).

26.     I, along with BankUnited, Inc., have stated to regulatory authorities and to the public that the non-compete agreements are in effect in the Tri-State Area until August 2012 and that BankUnited intends to expand into the Tri-State Area after the non-competition restrictions expire.

27.     I am aware that Capital One in the First Amended Complaint has alleged that BankUnited made a preemptive bid on a commercial real estate portfolio offered by the Bank of Ireland. This allegation is false. BankUnited made no bid at all for this portfolio, "preemptive" or otherwise.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING STATEMENTS ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

_4/6/12_
Date

_[signature]_
John A. Kanas

# Exhibit 1

## (Filed Under Seal)

## Kanas Declaration

# Exhibit 2

## (Filed Under Seal)

Kanas Declaration