# EXHIBIT #1

## (Redacted Exhibit)

## Singer Declaration

```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
                     ALEXANDRIA DIVISION

- - - - - - - - - - - - - -+
                           |
CAPITAL ONE FINANCIAL      |
CORPORATION,               |
                           |
         Plaintiff,        |   Civil Action No.
                           |
   vs.                     |
                           |
JOHN A. KANAS and          |
JOHN BOHLSEN,              |
                           |
         Defendants.       |
                           |
- - - - - - - - - - - - - -+
```

            *** HIGHLY CONFIDENTIAL ***

      Rule 30(b)(6) Videotaped Deposition of

        CAPITAL ONE FINANCIAL CORPORATION

   by and through its designated representative

                  JOHN FINNERAN

               Washington, D.C.
          Wednesday, February 8, 2012
                   9:38 a.m.


Job No. 77782

Pages 1 - 351

Reported by:  Laurie Bangart, RPR, CRR

Magna Legal Services

Page 46

```
10:15:01   1    refer to the page within a given exhibit.
10:15:09   2        A   Yes, I'm with you.
10:15:10   3        Q   Okay.  Does page 98 represent the
10:15:15   4    geographical areas covered for each of four
10:15:19   5    competitive businesses as to which John Bohlsen's
10:15:25   6    noncompete agreement ran?
10:15:28   7        A   Yes, it is.
10:15:28   8        Q   And so when you acquired North Fork in
10:15:32   9    2006, you had John Bohlsen sign a noncompete
10:15:35  10    agreement that applied to throughout the United
10:15:38  11    States, the United Kingdom and Canada with respect
10:15:41  12    to the credit card business; is that correct?
10:15:44  13        A   He signed, he signed an agreement that
10:15:45  14    was identical in most respects to the agreement
10:15:51  15    John Kanas signed, that's correct.
10:15:53  16        Q   Do you consider the positions that Kanas
10:15:55  17    and Bohlsen were going to serve at North Fork to
10:15:58  18    be identical -- excuse me -- at Capital One would
10:16:01  19    have been identical?
10:16:03  20        A   Well, they obviously were not identical.
10:16:06  21    Mr. Kanas, as I said, was going to be the
10:16:08  22    president of the banking business.  Mr. Bohlsen
```

Page 47

```
10:16:11   1    was going to be the head of the commercial lending
10:16:15   2    aspect of the, of the banking business, but again,
10:16:19   3    you know, it is a very senior position within
10:16:23   4    Capital One, and it -- you know, it both involves
10:16:27   5    a lot of interaction with, with other executives,
10:16:31   6    and again, because these agreements were done with
10:16:35   7    a forward-looking aspect to them.
10:16:37   8            It contemplated that they may very well
10:16:40   9    either have responsibility, over time, for some of
10:16:44  10    these other businesses or in the conduct of their,
10:16:46  11    of their business learn a sufficient amount of
10:16:51  12    proprietary and confidential information that it
10:16:53  13    would be appropriate to have a post-employment
10:16:56  14    restriction with respect to those businesses.
10:16:58  15        Q   What role was Mr. Bohlsen going to have
10:17:01  16    with respect to the auto lending business of
10:17:03  17    Capital One?
10:17:07  18        A   You know, again, because he ended up
10:17:09  19    only spending eight or nine months as an
10:17:12  20    executive, he, you know, never served beyond the
10:17:16  21    capacity that was originally assigned to, which
10:17:21  22    was head of the commercial lending arm within the
```

Page 48

```
10:17:25   1    commercial bank.  It doesn't mean that he might
10:17:31   2    not have evolved into broader responsibilities
10:17:34   3    over the course of the contemplated three-year
10:17:35   4    period or, you know, if there was extension of
10:17:36   5    employment beyond that period.
10:17:38   6        Q   Mr. Bohlsen was not on the board of
10:17:39   7    directors of Capital One; correct?
10:17:41   8        A   He was not.
10:17:42   9        Q   His noncompete, though, as you've
10:17:44  10    indicated, is just as broad as Mr. Kanas'; is that
10:17:48  11    right?
10:17:48  12        A   The scope --
10:17:49  13            MR. SNYDER:  Objection to form.
10:17:51  14            You may answer.
10:17:53  15            THE WITNESS:  The scope of the
10:17:53  16        noncompetes are, are identical.
10:18:01  17    BY MR. SINGER:
10:18:01  18        Q   Are there any discussions that you
10:18:03  19    recall with respect to Mr. Bohlsen or Mr. Kanas or
10:18:08  20    any representative of either of those gentlemen,
10:18:14  21    including their counsel, with respect to the scope
10:18:16  22    of the noncompete provisions in the 2006
```

Page 49

```
10:18:18   1    restricted stock agreements?
10:18:21   2            MR. SNYDER:  Objection.  Compound and
10:18:23   3        somewhat confusing.
10:18:24   4    BY MR. SINGER:
10:18:25   5        Q   If it's confusing to you, I'll break it
10:18:27   6    down.
10:18:28   7            Is it confusing?
10:18:29   8        A   Sure.  Why don't you break it down.
10:18:30   9        Q   Okay.  Let's start with Mr. Kanas.
10:18:32  10            Were there any communications that you
10:18:33  11    had with Mr. Kanas personally over the scope of
10:18:35  12    the 2006 noncompete agreement?
10:18:37  13        A   At what point in time?
10:18:38  14        Q   This would be during 2006.  So it would
10:18:41  15    either be before, during or after the execution
10:18:45  16    and closing of the acquisition of North Fork.
10:18:49  17        A   I'm, I'm sorry, because, you know,
10:18:51  18    there's, there certainly came a time when I had
10:18:55  19    conversations directly with Mr. Kanas about the
10:18:57  20    scope of the noncompete within the restricted
10:19:01  21    stock agreement.
10:19:01  22        Q   Was that --
```

13 (Pages 46 to 49)

Page 66

| Time | # | Text |
|---|---|---|
| 10:36:49 | 1 | infrastructure build to do. |
| 10:36:51 | 2 | When you put all of those things |
| 10:36:53 | 3 | together, you know, ensuring that John and John |
| 10:36:55 | 4 | could not come back, if for whatever reason they |
| 10:36:58 | 5 | may leave the company, within two years and build |
| 10:37:00 | 6 | a North Fork 2 was high on my list, you know, and |
| 10:37:06 | 7 | it's my responsibility to make sure that we are |
| 10:37:08 | 8 | protecting the asset that we're buying from a -- |
| 10:37:11 | 9 | protecting the confidential and proprietary |
| 10:37:14 | 10 | information, and, you know, it was just again |
| 10:37:19 | 11 | obvious to anybody at Capital One that we should |
| 10:37:23 | 12 | have a, a period of time, you know, and five years |
| 10:37:29 | 13 | felt appropriate for all of those reasons. |
| 10:37:31 | 14 | Q   Who picked five years in the first |
| 10:37:33 | 15 | place? |
| 10:37:33 | 16 | A   You know, I don't recall, but it was |
| 10:37:35 | 17 | probably me. |
| 10:37:35 | 18 | Q   Did you talk to anyone else at Capital |
| 10:37:37 | 19 | One about five years? |
| 10:37:38 | 20 | A   I talked to Mr. Abrams and I talked to |
| 10:37:40 | 21 | Mr. Fairbank. |
| 10:37:41 | 22 | Q   Did they suggest any other figure other |

Page 67

| Time | # | Text |
|---|---|---|
| 10:37:43 | 1 | than five years? |
| 10:37:44 | 2 | A   Not that I recall. |
| | | [redacted] |
| 10:38:04 | 11 | Q   Now, you had mentioned that one of the |
| 10:38:07 | 12 | reasons you thought five years was appropriate |
| 10:38:10 | 13 | related to the integration time that would be |
| 10:38:12 | 14 | needed for North Fork.  Do I -- is that one of |
| 10:38:15 | 15 | your reasons? |
| 10:38:16 | 16 | A   That's one of many. |
| 10:38:17 | 17 | Q   Can you explain how the time needed for |
| 10:38:19 | 18 | the integration in North Fork related to having a |
| 10:38:22 | 19 | five-year noncompete for a time period after Kanas |
| 10:38:26 | 20 | and Bohlsen would leave Capital One? |
| 10:38:34 | 21 | A   You never know, going into a transaction |
| 10:38:37 | 22 | like this, how long an executive will stay, and |

Page 68

| Time | # | Text |
|---|---|---|
| 10:38:43 | 1 | there are lots of provisions -- again, you know, |
| 10:38:44 | 2 | you keep wanting to focus on the noncompete |
| 10:38:47 | 3 | aspects of this agreement, but again, this is a |
| 10:38:50 | 4 | restricted stock agreement. |
| 10:38:52 | 5 | It embodied the basic terms under which |
| 10:38:56 | 6 | they would be senior executives at the company and |
| 10:38:58 | 7 | how they would be compensated, and again, as is |
| 10:39:01 | 8 | very typical in these kinds of, of arrangements, |
| 10:39:07 | 9 | when you're buying, you know, a company and the |
| 10:39:09 | 10 | senior executive of the company is going to stay |
| 10:39:12 | 11 | on for, you know, for a period of time, in almost |
| 10:39:17 | 12 | any circumstance other than the fellow up and |
| 10:39:20 | 13 | quitting one day and walking out of the place, |
| 10:39:23 | 14 | completely voluntarily, or you having cause, you |
| 10:39:28 | 15 | know, which is usually very narrowly defined, to |
| 10:39:32 | 16 | throw the bum out, you know, under almost any |
| 10:39:36 | 17 | other circumstance under which they leave, they |
| 10:39:38 | 18 | would get the full payout for whatever the period |
| 10:39:41 | 19 | of time was.  That's exactly the way this thing |
| 10:39:44 | 20 | worked. |
| 10:39:44 | 21 | So my job, when I'm thinking about how |
| 10:39:48 | 22 | to protect the asset that we're buying, is, you |

Page 69

| Time | # | Text |
|---|---|---|
| 10:39:51 | 1 | know, to hope and wish that everything happens |
| 10:39:56 | 2 | just exactly the way you expect them to and that |
| 10:39:59 | 3 | they will stay on for their full three years and |
| 10:40:02 | 4 | continue to be a member of the team, but my job is |
| 10:40:05 | 5 | also to assume that the day after they closed, for |
| 10:40:09 | 6 | some reason it terminates and we have, from that |
| 10:40:14 | 7 | day on, you get to start counting your noncompete, |
| 10:40:17 | 8 | because they're now into post-employment. |
| 10:40:20 | 9 | So that's my job as a lawyer is to think |
| 10:40:23 | 10 | of the worst case and make sure that we're |
| 10:40:25 | 11 | protected with respect to those worst cases. |
| 10:40:28 | 12 | Q   And the worst case would have been if he |
| 10:40:32 | 13 | left the day after you closed the transaction? |
| 10:40:34 | 14 | A   Yes.  Under any circumstances, and |
| 10:40:35 | 15 | there's a million circumstances under which people |
| 10:40:38 | 16 | could leave, including health reasons or they get |
| 10:40:39 | 17 | run over by a bus or anything like that. |
| 10:40:41 | 18 | Q   Now, you had indicated incentives for |
| 10:40:46 | 19 | them to stay.  You had a three-year vesting period |
| 10:40:49 | 20 | with respect to the restricted stock; correct? |
| 10:40:51 | 21 | MR. SNYDER:  Objection to form. |
| 10:40:52 | 22 | You can answer. |

18 (Pages 66 to 69)

Page 70

| Time | # | Text |
|---|---|---|
| 10:40:53 | 1 | THE WITNESS: Yes. |
| 10:40:53 | 2 | BY MR. SINGER: |
| 10:40:53 | 3 | Q  And that meant they had to stay there |
| 10:40:55 | 4 | for three years in order for the stock grants |
| 10:40:58 | 5 | under the restricted stock agreement to be fully |
| 10:41:01 | 6 | vested; is that correct? |
| 10:41:01 | 7 | A  If they, if they remained employed for |
| 10:41:05 | 8 | the entire period, it would have vested at the end |
| 10:41:07 | 9 | of the three-year period, that's correct. |
| 10:41:10 | 10 | Q  And the restricted stock was an |
| 10:41:12 | 11 | incentive then for these individuals not just not |
| 10:41:15 | 12 | to compete against Capital One but to work for |
| 10:41:17 | 13 | Capital One for a three-year period; correct? |
| 10:41:19 | 14 | MR. SNYDER: Objection to form. |
| 10:41:20 | 15 | You can answer. |
| 10:41:23 | 16 | THE WITNESS: The compensation that was |
| 10:41:24 | 17 | provided in the agreement was for the entire |
| 10:41:26 | 18 | agreement, you know, which contemplated that |
| 10:41:30 | 19 | they would both provide some services as well |
| 10:41:32 | 20 | as that they would not compete, you know, |
| 10:41:35 | 21 | after the fact, that's correct. |

Page 71

| Time | # | Text |
|---|---|---|
| 10:41:37 | 1 | BY MR. SINGER: |
| 10:41:37 | 2 | Q  Are you able to break down how much of |
| 10:41:39 | 3 | the stock related to one item versus another? |
| 10:41:42 | 4 | A  No. |
| 10:41:56 | 5 | MR. SINGER: We've been going for a bit. |
| 10:41:58 | 6 | Why don't we take a few minutes. |
| 10:42:01 | 7 | MR. SNYDER: Sure. |
| 10:42:02 | 8 | THE VIDEOGRAPHER: The time is |
| 10:42:04 | 9 | 10:41 a.m. Going off the record. |
| 10:42:07 | 10 | (Whereupon, a short recess was taken.) |
| 10:57:12 | 11 | THE VIDEOGRAPHER: The time is 10:57 |
| 10:57:12 | 12 | a.m., February 8, 2012. On the record with |
| 10:57:17 | 13 | video 2. |
| 10:57:18 | 14 | BY MR. SINGER: |
| 10:57:20 | 15 | Q  Mr. Finneran, are there any other |
| 10:57:21 | 16 | conversations you recall during 2006 with |
| 10:57:24 | 17 | Mr. Kanas or with Mr. Bohlsen regarding their |
| 10:57:29 | 18 | noncompetes that you were a party to? |
| 10:57:32 | 19 | A  I'm sorry. Direct conversations with |
| 10:57:33 | 20 | the two of those? |
| 10:57:35 | 21 | Q  Yes. |
| 10:57:35 | 22 | A  As, as I testified earlier, I didn't |

Page 72

| Time | # | Text |
|---|---|---|
| 10:57:37 | 1 | have any direct conversations with either of them |
| 10:57:39 | 2 | prior to their execution of the agreement, and I |
| 10:57:43 | 3 | don't recall whether I had any in '06. I |
| 10:57:46 | 4 | certainly had some in '07 with Mr. Kanas. |
| 10:57:49 | 5 | Q  Okay. When did the transaction close? |
| 10:57:54 | 6 | A  In December of 2006. |
| 10:57:57 | 7 | Q  As we move then into 2007, was Capital |
| 10:58:00 | 8 | One's management happy with the job that Kanas and |
| 10:58:03 | 9 | Bohlsen were doing in discharging their |
| 10:58:06 | 10 | responsibilities? |
| 10:58:07 | 11 | MR. SNYDER: Objection. I would say |
| 10:58:12 | 12 | confusing. |
| 10:58:14 | 13 | BY MR. SINGER: |
| 10:58:14 | 14 | Q  Okay. If you understand the question, |
| 10:58:15 | 15 | please answer it. |
| 10:58:17 | 16 | A  Well, I'm not sure what you mean by |
| 10:58:19 | 17 | "happy," but, well, let me again back up, because |
| 10:58:21 | 18 | I think some context is, is helpful here. |
| 10:58:30 | 19 | During the entire period of time between |
| 10:58:32 | 20 | the announcement of the acquisition and the |
| 10:58:33 | 21 | closing of the acquisition, which in this case was |
| 10:58:37 | 22 | an eight-month period of time of, you know, going |

Page 73

| Time | # | Text |
|---|---|---|
| 10:58:41 | 1 | through the application process and getting |
| 10:58:43 | 2 | regulatory approval and all of that, there's a lot |
| 10:58:46 | 3 | of activity that the management teams can legally |
| 10:58:51 | 4 | and appropriately engage in in terms of planning |
| 10:58:55 | 5 | for the integration and, you know, thinking |
| 10:58:58 | 6 | through all of those outputs, intakes. |
| 10:59:02 | 7 | The actual job of managing the business |
| 10:59:08 | 8 | and directing what happens if the acquired entity |
| 10:59:13 | 9 | cannot occur until the closing date, because |
| 10:59:15 | 10 | you're not allowed to manage the entity until, you |
| 10:59:19 | 11 | know, you get the full regulatory approval and you |
| 10:59:22 | 12 | close. |
| 10:59:23 | 13 | So, you know, with that context, you |
| 10:59:26 | 14 | know, Mr. Kanas and Mr. Bohlsen didn't really |
| 10:59:28 | 15 | begin to work as part of the Capital One executive |
| 10:59:31 | 16 | team until, you know, early December of 2006. |
| 10:59:41 | 17 | Q  Recognizing that, what was the reaction, |
| 10:59:44 | 18 | after they had been working there for let's say |
| 10:59:47 | 19 | the first quarter of 2007, of Capital One senior |
| 10:59:51 | 20 | management to the job that they were doing? |
| 10:59:55 | 21 | MR. SNYDER: Same objection. Confusing. |
| 10:59:57 | 22 | You may answer. |

Page 126

```
12:15:22   1   general counsel to protect the proprietary and
12:15:25   2   confidential information of the -- of Capital One.
12:15:31   3       Because of the short-term nature of
12:15:36   4   their actual employment and because of the way
12:15:39   5   they actually conducted themselves during the
12:15:42   6   period of time that they were employees, they were
12:15:48   7   not, in my judgment, a competitive risk with
12:15:51   8   respect to the card business or the auto business.
12:15:55   9       And so there was not a particular need,
12:15:58  10   from a Capital One perspective, now that I had the
12:16:03  11   benefit of knowing exactly what they knew and what
12:16:07  12   they had been exposed to, to, you know, continue
12:16:10  13   to have a restriction on their ability to engage
12:16:17  14   in credit card lending or auto lending to the
12:16:21  15   extent that those are outside of the construct of
12:16:24  16   what the banking business, the commercial and
12:16:28  17   retail banking business is, you know, within the
12:16:31  18   tri-state area that we ultimately, you know, were
12:16:36  19   trying to make sure that we, that we preserved.
12:16:40  20       So in conversations with John, I let him
12:16:42  21   know that.  I also let him know that we clearly
12:16:47  22   did need to have a noncompete with respect to
```

Page 127

```
12:16:51   1   commercial and consumer banking.  You know, we had
12:16:56   2   conversations, quite frankly, about what the
12:16:58   3   geographic scope should be.
12:17:01   4       Again, I made the judgment, you know,
12:17:05   5   and I think it was after I was chatting with John
12:17:08   6   and I understood what his interests and desires
12:17:11   7   might be, that again, given what he and John
12:17:16   8   Bohlsen actually did and how much they really
12:17:20   9   truly learned and understood about the banking
12:17:25  10   business that we were engaged in in Louisiana and
12:17:27  11   Texas, that I didn't feel the need, in order to
12:17:33  12   include Louisiana and Texas in the scope of the
12:17:38  13   subsequent noncompete, notwithstanding the fact
12:17:41  14   that we were engaged in that business in those
12:17:45  15   locations, and notwithstanding the fact that John
12:17:48  16   and John were in charge of those businesses at
12:17:51  17   least for, you know, what ended up being a seven-
12:17:56  18   or eight-month, eight-month period.
12:17:59  19       So in these conversations John made
12:18:01  20   it -- you know, I mean he shared with me -- again,
12:18:04  21   I had a very open and good relationship with John
12:18:07  22   Kanas.  I, I enjoyed my interactions with him.  I
```

Page 128

```
12:18:11   1   think he was open with me, and I was, you know,
12:18:15   2   open with him.
12:18:17   3       He told me what his interests were.  I
12:18:19   4   don't think that they had fully formed, but he did
12:18:24   5   mention that he may very well want to get into an
12:18:28   6   advisory role with hedge funds and that he may
12:18:35   7   very much want to get into an advisory role with
12:18:38   8   investment banks where he could, you know,
12:18:42   9   potentially, you know, use the knowledge that he's
12:18:46  10   acquired, you know, as a banker for 30 years, in a
12:18:51  11   way that wouldn't be competitive with Capital One
12:18:55  12   in, you know, the tri-state, tri-state areas.
12:18:58  13       And, you know -- and I -- over time, you
12:19:03  14   know, I think he and I had a meeting of the minds
12:19:07  15   of the scope of the noncompete, you know, and what
12:19:14  16   he would be free to do and what he would not be
12:19:18  17   free to do for the five-year period following his,
12:19:24  18   following his termination of employment, and, you
12:19:28  19   know, I think that you'll see some of those things
12:19:31  20   reflected in the way the agreement was drafted and
12:19:34  21   the way some of the exceptions were, were drafted.
12:19:40  22    Q   Did the discussions you had with
```

Page 129

```
12:19:42   1   Mr. Kanas on this topic precede the drafting of
12:19:46   2   the documents, or did it go hand and hand?
12:19:50   3    A   Yes.  It preceded the drafting of the
12:19:52   4   documents.  He went off and talked with his
12:19:54   5   attorneys at Wachtell, and they produced the first
12:19:56   6   draft that reflected, you know, a lot of what
12:20:01   7   ended up being in the final draft, including the,
12:20:06   8   the exceptions that, you know, I know are, you
12:20:10   9   know, at the heart of some of the disputes that,
12:20:14  10   you know, are at issue in this case.
```

[Remainder of page 129 redacted]

Page 134

```
12:25:29   1   constructs that banking business.
12:25:34   2        "Yes" is the answer to your question.
12:25:36   3   We were concerned that no matter where, what
12:25:37   4   the source of the information, when they
12:25:39   5   acquired it, it belonged to Capital One as of
12:25:42   6   December of 2006.  It was our information.
12:25:44   7   We paid for it.
12:25:46   8        They had a close identity with the
12:25:49   9   customers, in the customers' mind, with
12:25:53  10   respect to North Fork.  It's understandable.
12:25:55  11   They did a great job in building that
12:25:57  12   business.  I wouldn't hold that from them at
12:25:59  13   all.  It was many of the things that
12:26:01  14   attracted, you know, the business to us, but
12:26:04  15   when we paid $13.2 billion, we expected them
12:26:08  16   not to compete with us and build a North
12:26:11  17   Fork 2 for five years after they left our
12:26:15  18   employ, no matter when it was that they left
12:26:19  19   the employ of Capital One.  That was our
12:26:21  20   expectation, and it was important.
12:26:22  21   BY MR. SINGER:
12:26:22  22   Q    But my question, Mr. Finneran -- and if
```

Page 135

```
12:26:24   1   it's not clear to you, I'll try.  We're focused on
12:26:27   2   the position that someone has at Capital One.
12:26:30   3   We're not talking about information from North
12:26:32   4   Fork.  We're not talking about relationships.
12:26:35   5        Is it important to Capital One that
12:26:38   6   someone would occupies the position of head of
12:26:40   7   consumer and commercial banking at Capital One be
12:26:44   8   restricted by a noncompete so they do not use
12:26:47   9   confidential information in subsequent work?
12:26:50  10   A    So just to be clear, are we talking
12:26:52  11   about a hypothetical individual here, or are we
12:26:54  12   talking about Mr. Kanas and Mr. Bohlsen?
12:26:56  13   Q    We're not talking Kanas and Bohlsen.
12:26:59  14   A    Okay.  It depends on the facts and
12:27:00  15   circumstances.
12:27:01  16   Q    Well, let's talk about Ms. Carter.
12:27:03  17        Do you have a noncompete with her?
12:27:07  18   A    You know, I don't even know.
12:27:09  19   Q    Okay.  Ms. Carter is the president of --
12:27:12  20   what position does Ms. Carter hold?
12:27:16  21   A    She's, she's resigned.  She no longer
12:27:22  22   holds a position.
```

Page 136

```
12:27:23   1   Q    Prior to that resignation, what position
12:27:25   2   did she hold?
12:27:26   3   A    She was, until sometime last year, the
12:27:28   4   president of our banking business.
12:27:30   5   Q    Was she a successor to John Kanas?
12:27:33   6   A    She was.
12:27:33   7   Q    Did she have access to confidential
12:27:35   8   information at Capital One?
12:27:37   9   A    Yes, she did.
12:27:39  10   Q    Throughout the time that she was
12:27:40  11   president?
12:27:41  12   A    I'm sure she did.
12:27:44  13   Q    Did she also, in that role, have the
12:27:47  14   opportunity to form relationships with customers
12:27:49  15   who she would meet?
12:27:52  16   A    She may have.  I wouldn't know.
12:28:01  17   Q    Did Capital One ask her to sign a
12:28:04  18   noncompete agreement?
12:28:06  19   A    I don't -- you know, I don't know if we
12:28:08  20   did or not.
12:28:09  21   Q    And you already testified you don't know
12:28:11  22   if she actually did so; correct?
```

Page 137

```
12:28:14   1   A    I don't.
12:28:15   2   Q    Well, going back to, to John Kanas, is
12:28:20   3   there any -- you mentioned you had these, these
12:28:23   4   conversations over a period of, of time.
12:28:27   5        Who initiated the discussion with
12:28:32   6   respect to changes in the noncompete; was it you,
12:28:35   7   or was it Mr. Kanas?
12:28:41   8   A    You know, I don't remember who initiated
12:28:43   9   it.  I mean it evolved out of the conversations
12:28:46  10   when we were talking about the, you know, how to,
12:28:50  11   you know -- and again, you know, my initial
12:28:55  12   conversations with John were about the principles
12:28:59  13   and the goals that hopefully we would mutually try
12:29:03  14   to achieve.
12:29:05  15        Out of that, you know, I can't remember
12:29:07  16   whether I was the first one to say, you know, I
12:29:10  17   would be flexible about, you know, making some
12:29:12  18   appropriate changes to the noncompete or whether
12:29:14  19   he asked me for those, because he had some notion
12:29:18  20   of what he might like to do, either with a hedge
12:29:21  21   fund or an investment bank.
12:29:23  22        Those are the two examples that I refer
```

35 (Pages 134 to 137)

Page 138

| Time | Line | Text |
|---|---|---|
| 12:29:26 | 1 | to, because those specifically he mentioned to me, |
| 12:29:29 | 2 | and I have a very firm recollection of him talking |
| 12:29:32 | 3 | about those as possibilities of what he would like |
| 12:29:35 | 4 | to do, and we talked about that scope, just as |
| 12:29:38 | 5 | well as I talked, as I said earlier, about, you |
| 12:29:42 | 6 | know, John, I'm not sure that I really have a true |
| 12:29:45 | 7 | need to noncompete you and John Bohlsen from the |
| 12:29:49 | 8 | auto business or from the credit card business. |
| 12:29:53 | 9 | Q  If Mr. Kanas was deciding to, to use |
| 12:29:56 | 10 | your term, "throw in the towel," why were you |
| 12:29:58 | 11 | willing to make any changes whatever in connection |
| 12:30:01 | 12 | with the scope of his noncompete agreement? |
| 12:30:06 | 13 | A  I am not in the business of |
| 12:30:08 | 14 | inappropriately restricting people's post- |
| 12:30:12 | 15 | employment opportunities, you know, and if there's |
| 12:30:14 | 16 | not a true business need, then, you know, it's |
| 12:30:18 | 17 | just not something that, you know, I think that |
| 12:30:20 | 18 | strikes the appropriate balance of, you know, how |
| 12:30:23 | 19 | we treat our executives. |
| 12:30:50 | 20 | Q  Did you believe that the noncompete |
| 12:30:55 | 21 | provisions of the restricted stock agreement would |
| 12:30:57 | 22 | constitute an inappropriate restriction on Kanas' |

Page 139

| Time | Line | Text |
|---|---|---|
| 12:31:00 | 1 | post-employment opportunity if those had not been |
| 12:31:03 | 2 | modified? |
| 12:31:04 | 3 | A  I didn't think it was necessary.  I |
| 12:31:07 | 4 | didn't -- you know, I wasn't, you know . . . |
| 12:31:12 | 5 | Q  Did you form any opinion as to whether |
| 12:31:16 | 6 | or not the original provisions of the noncompete |
| 12:31:17 | 7 | and the restricted stock agreement were |
| 12:31:20 | 8 | unenforceable as written? |
| 12:31:22 | 9 | MR. SNYDER:  Objection to form. |
| 12:31:23 | 10 | You may answer. |
| 12:31:25 | 11 | THE WITNESS:  No, I never formed that |
| 12:31:26 | 12 | opinion.  They were clearly -- my belief is |
| 12:31:29 | 13 | that they were enforceable at the time they |
| 12:31:32 | 14 | were executed in March of '06. |
| 12:31:35 | 15 | BY MR. SINGER: |
| 12:31:35 | 16 | Q  Do you believe they were enforceable at |
| 12:31:36 | 17 | the time that Kanas and Bohlsen left? |
| 12:31:39 | 18 | A  Yes. |
| 12:31:40 | 19 | Q  So in your belief, it would have been |
| 12:31:42 | 20 | appropriate to restrain Kanas and Bohlsen on a |
| 12:31:45 | 21 | geographic scope as broad as the one set forth in |
| 12:31:48 | 22 | the restricted stock agreement? |

Page 140

| Time | Line | Text |
|---|---|---|
| 12:31:50 | 1 | A  If the question is did I think it was |
| 12:31:52 | 2 | legally necessary to change the noncompete?  The |
| 12:31:57 | 3 | answer is no, I didn't think it was legally |
| 12:31:59 | 4 | necessary.  So let me explain, because you may not |
| 12:32:01 | 5 | have noticed this, but I'm sure you have if you |
| 12:32:04 | 6 | read the agreement. |
| 12:32:06 | 7 | The agreements are not automatically |
| 12:32:09 | 8 | barring of an executive.  There is what we refer |
| 12:32:11 | 9 | to as a "look-back" period, which says they're |
| 12:32:15 | 10 | only enforceable with respect to a particular line |
| 12:32:18 | 11 | of business if the executive, in the last two |
| 12:32:21 | 12 | years, played a role in managing and directing |
| 12:32:25 | 13 | that business or they were otherwise exposed to |
| 12:32:29 | 14 | significant amounts of confidential and |
| 12:32:34 | 15 | proprietary information. |
| 12:32:36 | 16 | Q  In your view -- |
| 12:32:38 | 17 | A  So what I would normally do when an |
| 12:32:40 | 18 | executive leaves, and if he or she has a provision |
| 12:32:44 | 19 | in that, at the time they leave, we would tell |
| 12:32:48 | 20 | them what we thought the scope was, and we would |
| 12:32:53 | 21 | go through the process internally at Capital One |
| 12:32:55 | 22 | and say, okay, if Sally is leaving, where has |

Page 141

| Time | Line | Text |
|---|---|---|
| 12:32:59 | 1 | Sally worked for the last two years, and what do |
| 12:33:03 | 2 | we think Sally knew or acquired about a particular |
| 12:33:06 | 3 | business that may be reflected in her noncompete. |
| 12:33:11 | 4 | And at the time Sally would leave, we |
| 12:33:13 | 5 | would say, okay, Sally, you worked in the X |
| 12:33:16 | 6 | business for the last three years that you've been |
| 12:33:19 | 7 | at Capital One.  The Y business you've never |
| 12:33:23 | 8 | worked in it, and you didn't really, you know, get |
| 12:33:26 | 9 | the secret sauce, trade secrets, proprietary |
| 12:33:30 | 10 | confidential information of the Y business.  So |
| 12:33:33 | 11 | therefore, you know, your noncompete, we're not |
| 12:33:37 | 12 | imposing a post-employment restriction with |
| 12:33:40 | 13 | respect to that business, but only the business in |
| 12:33:42 | 14 | which you worked.  Okay? |
| 12:33:44 | 15 | So that's kind of the principle behind |
| 12:33:46 | 16 | it.  So if I didn't have that conversation with |
| 12:33:49 | 17 | John when I assessed the situation and I looked, |
| 12:33:53 | 18 | you know, well, he hadn't worked in the card |
| 12:33:56 | 19 | business, and because of his relatively short |
| 12:33:59 | 20 | period of time that he was there and the way he |
| 12:34:01 | 21 | conducted his activity there, which was not, you |
| 12:34:04 | 22 | know, as engaging of the other executives as is |

Page 198

| | | |
|---|---|---|
| 02:23:32 | 1 | MR. SNYDER: Objection. The inclusion |
| 02:23:34 | 2 | of the word "so" purports to summarize prior |
| 02:23:38 | 3 | testimony, and to that extent misstates prior |
| 02:23:40 | 4 | testimony. |
| 02:23:41 | 5 | You may answer. |
| 02:23:42 | 6 | MR. SINGER: I'll just withdraw the |
| 02:23:43 | 7 | question. I think we have your answer. |
| 02:23:45 | 8 | BY MR. SINGER: |
| 02:23:45 | 9 | Q   How about talking to other people who |
| 02:23:48 | 10 | he is colleagues with; is that a prohibition of |
| 02:23:52 | 11 | the covenant, in your view? |
| 02:23:54 | 12 | MR. SNYDER: Object to form. Vague and |
| 02:23:56 | 13 | ambiguous as to talking to people. |
| 02:23:57 | 14 | You may answer. |
| 02:23:58 | 15 | BY MR. SINGER: |
| 02:23:58 | 16 | Q   I'll be more specific. Mr. Kanas |
| 02:24:01 | 17 | talking with Mr. Volson (assumed spelling) before |
| 02:24:03 | 18 | August 6, 2012, about their intentions to open up |
| 02:24:06 | 19 | branches in the tri-state area after the covenant |
| 02:24:10 | 20 | expires; in your view, is that prohibited by the |
| 02:24:12 | 21 | covenant? |
| 02:24:13 | 22 | A   That depends. |

Page 199

| | | |
|---|---|---|
| 02:24:14 | 1 | Q   On what? |
| 02:24:16 | 2 | A   The extent and the nature of the |
| 02:24:18 | 3 | conversations. If it, if it melds into business |
| 02:24:23 | 4 | planning for purposes of engaging in this |
| 02:24:28 | 5 | business, that is part and parcel of the business |
| 02:24:31 | 6 | that is prohibited. |
| 02:24:33 | 7 | Q   Well, when does a conversation become |
| 02:24:35 | 8 | business planning? |
| 02:24:39 | 9 | MR. SNYDER: Objection to form. |
| 02:24:40 | 10 | Argumentative. |
| 02:24:41 | 11 | You may answer. |
| 02:24:43 | 12 | THE WITNESS: You know, I'm sure there's |
| 02:24:45 | 13 | a point at which it does. |
| 02:24:47 | 14 | BY MR. SINGER: |
| 02:24:47 | 15 | Q   But you can't articulate it? |
| 02:24:49 | 16 | A   I would certainly know it when I saw it. |
| 02:24:53 | 17 | Q   Okay. Announcing publicly to the public |
| 02:25:01 | 18 | that you intend to get back into business after |
| 02:25:04 | 19 | your covenant expires; in your view, does that in |
| 02:25:08 | 20 | itself constitute a violation of the restricted |
| 02:25:12 | 21 | covenant? |
| 02:25:13 | 22 | A   Absolutely. Mr. Kanas is trading on the |

Page 200

| | | |
|---|---|---|
| 02:25:15 | 1 | very goodwill that we bought when we paid |
| 02:25:21 | 2 | $13.2 billion to buy North Fork. He is |
| 02:25:24 | 3 | advertising. He's marketing. You know, he may be |
| 02:25:28 | 4 | doing it in his own way. He's communicating to |
| 02:25:33 | 5 | customers that may very well be our customers or |
| 02:25:36 | 6 | customers that we would be competing for in that |
| 02:25:40 | 7 | market, and making it very clear that they can |
| 02:25:43 | 8 | either come to him now in his bank in Florida or |
| 02:25:46 | 9 | that he would soon be here, in violation of this |
| 02:25:48 | 10 | noncompete. That's violative of this noncompete. |
| 02:25:51 | 11 | Q   Even if the announcement was very clear |
| 02:25:53 | 12 | that no branch would open in New York until after |
| 02:25:58 | 13 | August 6 of 2012? |
| 02:26:00 | 14 | MR. SNYDER: Objection. Lacks |
| 02:26:00 | 15 | foundation and is argumentative. |
| 02:26:03 | 16 | You may answer. |
| 02:26:05 | 17 | THE WITNESS: The answer is that that is |
| 02:26:07 | 18 | marketing. That is part of the business of |
| 02:26:11 | 19 | commercial banking. So doing that, no matter |
| 02:26:14 | 20 | what date you said you were going to do it, |
| 02:26:17 | 21 | if you're doing it in this five-year period, |
| 02:26:20 | 22 | it's prohibited by this covenant. |

Page 201

| | | |
|---|---|---|
| 02:26:23 | 1 | BY MR. SINGER: |
| 02:26:23 | 2 | Q   Okay. So let's say hypothetically, the |
| 02:26:25 | 3 | day before the covenant expires, August 5, you |
| 02:26:30 | 4 | wanted to announce you were going to get into |
| 02:26:32 | 5 | business on August 6, that would be a violation of |
| 02:26:35 | 6 | the covenant, because it's announcing your intent |
| 02:26:39 | 7 | to compete? |
| 02:26:40 | 8 | A   That's correct. |
| 02:26:41 | 9 | Q   And similarly, leasing a branch location |
| 02:26:47 | 10 | on August 5, 2012, would also be a violation even |
| 02:26:50 | 11 | if it wasn't going to open until later? |
| 02:26:53 | 12 | A   That's correct. |
| 02:26:54 | 13 | Q   And you say this, recognizing that there |
| 02:26:55 | 14 | is a startup time to open branch locations, begin |
| 02:27:00 | 15 | doing business in a given location? |
| 02:27:04 | 16 | A   That's part of the business of banking. |
| 02:27:05 | 17 | Securing employees, marketing, opening or |
| 02:27:11 | 18 | selecting locations in which to engage with |
| 02:27:14 | 19 | customers is all part of the business of banking. |
| 02:27:17 | 20 | That's what was prohibited by this, by this thing. |
| 02:27:21 | 21 | I reject the content -- the context that |
| 02:27:26 | 22 | those things are somehow, quote-unquote, |

Page 202

```
02:27:27   1   preparatory to the business.  They're part and
02:27:32   2   parcel of this business that was prohibited.
02:27:35   3       Q   When did you first learned that
02:27:37   4   BankUnited was intending or had announced that it
02:27:39   5   was intending to open branches in New York after
02:27:42   6   August 6, 2012?
02:27:44   7           MR. SNYDER:  You may answer.
02:27:45   8           THE WITNESS:  Sometime in the last year.
02:27:47   9   I don't know exactly when.
02:27:50  10   BY MR. SINGER:
02:27:51  11       Q   You're aware that Mr. Kanas and Bohlsen
02:27:52  12   were part of an investor group that acquired
02:27:55  13   assets that used to be BankUnited FSB in 2009?
02:27:59  14       A   Yes, I am.
02:28:00  15       Q   Are you aware that statements were made
02:28:03  16   by Kanas and Bohlsen about when they, their
02:28:07  17   covenants expired, that they intended to come back
02:28:10  18   into New York?
02:28:11  19       A   At what point in time?
02:28:13  20       Q   In 2009 and 2010.
02:28:15  21       A   I just answered that I was aware
02:28:17  22   sometime in the last year.
```

Page 203

```
02:28:19   1       Q   Were you aware -- was it brought to your
02:28:21   2   attention when those public statements were made?
02:28:23   3           MR. SNYDER:  Objection to form.  Vague
02:28:24   4   and ambiguous as to time.
02:28:25   5       You may answer.
02:28:44   6       John, I think there's a question
02:28:45   7   pending.  Do you want to read the last
02:28:49   8   question?
02:28:56   9           THE WITNESS:  Oh, I'm sorry.
02:28:57  10           (Whereupon, reporter reads requested
02:28:57  11   material.)
02:29:00  12           THE WITNESS:  I'm sorry.  Which, which
02:29:01  13   time period are we talking about again,
02:29:04  14   Mr. Singer?
02:29:06  15   BY MR. SINGER:
02:29:06  16       Q   Well, let's -- for example, you can look
02:29:08  17   at page 13 of the complaint, which refers to a
02:29:11  18   "registration statement filed with the U.S.
02:29:16  19   Securities & Exchange Commission on October 29,
02:29:20  20   2010, whereby BankUnited informed its potential
02:29:23  21   shareholders it sought to expand operations in
02:29:27  22   select markets such as New York, because its
```

Page 204

```
02:29:30   1   management team," so forth and so on.
02:29:33   2       Were you aware of that statement in
02:29:34   3   October of 2010?
02:29:35   4       A   Not that I recall.
02:29:37   5       Q   So it's your testimony that you only
02:29:41   6   learned of public statements made by Mr. Kanas and
02:29:45   7   Mr. Bohlsen about the intent to open branches in
02:29:47   8   New York after the covenant expired sometime in
02:29:50   9   the last year?
02:29:51  10           MR. SNYDER:  Objection.  Misstates his
02:29:53  11   testimony.
02:29:54  12       You may answer.
02:29:55  13           THE WITNESS:  I said, look, I don't
02:29:57  14   remember the specific date.  My recollection
02:29:59  15   is I believe it was sometime in the last year
02:30:01  16   when I became aware of the kind of comments
02:30:04  17   that, you know, Mr. Kanas and Mr. Bohlsen had
02:30:07  18   been making.
02:30:09  19   BY MR. SINGER:
02:30:09  20       Q   How soon was it before this lawsuit was
02:30:11  21   filed that you first became aware of that?
02:30:15  22       A   You know, I don't, I don't have a
```

Page 205

```
02:30:16   1   specific recollection.  When was the -- the
02:30:18   2   lawsuit was filed when?  Sometime during the
02:30:20   3   summer; right?
02:30:28   4       Q   In your discussions with Mr. Kanas in
02:30:31   5   the time period that this was negotiated in 2007,
02:30:36   6   do you recall any discussions about the issue of
02:30:38   7   planning or preparing to compete?
02:30:41   8       A   I'm sorry.  We're now talking -- we're
02:30:43   9   now back in the time --
02:30:44  10       Q   Yes, we're back in 2006.
02:30:44  11       A   -- when we were talking about the
02:30:45  12   separation agreement?
02:30:46  13       Q   That's correct.
02:30:48  14       A   I'm sorry.  Please repeat the question.
02:30:50  15       Q   Are there any discussions that you
02:30:51  16   recall having with Mr. Kanas during that time
02:30:53  17   frame when this was being negotiated where you
02:30:57  18   said in words or effect that we view you preparing
02:31:00  19   to compete, looking at branch locations, hiring
02:31:04  20   people as being prohibited by the terms of this
02:31:07  21   agreement?  Any discussion on that subject?
02:31:10  22       A   I don't believe he asked me any
```

Page 234

```
02:59:06   1   the assets of BankUnited FSB from the FDIC, that
02:59:11   2   in that mix may have been loans on property in the
02:59:14   3   tri-state area?
02:59:15   4       A   I think I've already answered that
02:59:16   5   question.  I was unaware of any loans that were in
02:59:19   6   the portfolios that they bought from the FDIC
02:59:22   7   were, you know, secured by assets in New York,
02:59:27   8   Connecticut or New Jersey.
02:59:28   9       Q   And I take it your view is that there's
02:59:29  10   no threshold to such loans.  If they had one loan
02:59:32  11   for a hundred dollars that was made to someone in
02:59:35  12   New York, that would have been a violation of the
02:59:36  13   covenant; correct?
02:59:38  14       A   It would have been a technical violation
02:59:39  15   of the covenant.
02:59:44  16       Q   And it's your view that any loans that
02:59:47  17   BankUnited may have acquired in that manner that
02:59:52  18   are in the tri-state area violate Kanas and
02:59:57  19   Bohlsen's covenant even if Kanas and Bohlsen had
02:59:59  20   absolutely nothing to do with the making or
03:00:01  21   management of those loans?
03:00:03  22       MR. SNYDER:  I would object, because
```

Page 235

```
03:00:05   1   that question lacks foundation.
03:00:09   2       You may answer.
03:00:11   3       THE WITNESS:  I'm sorry.  Could you
03:00:12   4   restate it.
03:00:14   5   BY MR. SINGER:
03:00:14   6       Q   Sure.  I'll restate it instead of having
03:00:17   7   it read back.
03:00:18   8       It is your view that BankUnited's
03:00:21   9   holding loans that it acquired from the FDIC in
03:00:25  10   the tri-state area is a violation of Kanas and
03:00:30  11   Bohlsen's noncompete agreement, even if Kanas and
03:00:34  12   Bohlsen had absolutely nothing to do with the
03:00:36  13   making of those loans?
03:00:38  14       A   As officers and directors of the
03:00:40  15   BankUnited, they're engaged in the business of
03:00:44  16   managing banking products in the area that's
03:00:49  17   within the scope of the, of the noncompete, so
03:00:52  18   yes, that would be violative of the noncompete.
03:00:55  19       Q   And the same would be true even if Kanas
03:00:57  20   and Bohlsen had nothing to do with the management
03:00:59  21   of those loans?
03:01:02  22       A   I don't know what you mean by they have
```

Page 236

```
03:01:04   1   nothing to do with the management of that loan.
03:01:06   2   If they -- if you are the CEO of an institution
03:01:08   3   and the director of an institution, you cannot
03:01:10   4   wash your hands of any aspect of the management of
03:01:14   5   the bank's assets, so they're involved in the
03:01:18   6   management of those loans.  It's a hypothetical
03:01:21   7   without, you know, without any basis in reality.
03:01:25   8       Q   Well, that, that's -- I just wanted to
03:01:27   9   establish your position, and your position is
03:01:29  10   because Kanas is a CEO and Bohlsen is the number
03:01:33  11   two man at BankUnited, in your view, that means
03:01:38  12   every loan of that institution is one in which
03:01:41  13   they're involved in.
03:01:43  14       A   They have responsibilities associated
03:01:45  15   with the management of those banking products.
03:01:50  16       The whole intent of this noncompete was
03:01:53  17   not to have them serving as officers and directors
03:01:59  18   of a banking business engaged in that business in
03:02:02  19   the tri-state area.  If, as it turns out, that's
03:02:06  20   what BankUnited was at the time they acquired the
03:02:09  21   assets, that's a violation of the noncompete.
03:02:11  22       Q   And under your interpretation of the
```

Page 237

```
03:02:13   1   noncompete, wherever in the United States Kanas
03:02:16   2   and Bohlsen may have associated themselves with a
03:02:19   3   bank, if that bank had a loan that was with a
03:02:22   4   customer in the tri-state area, that would mean
03:02:26   5   that Kanas and Bohlsen were in violation of their
03:02:29   6   noncompete agreement?
03:02:29   7       A   Yep, and all they would have had to
03:02:31   8   do -- if it was de minimus, they could have called
03:02:34   9   us up, and I'm sure we could have had a
03:02:36  10   conversation about it.  They didn't.
03:02:41  11       Q   Did you have any discussions in your
03:02:43  12   meetings in May or June of 2007 with Mr. Kanas
03:02:48  13   about what I've termed these legacy loans, the
03:02:51  14   issue of if you go into business and you buy
03:02:54  15   assets, and they turn out to have some loans in
03:02:57  16   the tri-state area, whether that's a problem?
03:03:00  17       A   I've already described the --
03:03:02  18       Q   The issue didn't come up?
03:03:03  19       A   -- the extent of the conversations.  You
03:03:04  20   know, the, the issue was not focused on their
03:03:07  21   reentering the business, because that's not where
03:03:10  22   they were focused at the, at the moment, or if
```

Page 246

```
03:28:45   1   loans might be in the tri-state area within those
03:28:48   2   loan pools?
03:28:48   3       A   They, you know, they would all be
03:28:49   4   technical violations.  Again, you know, whether
03:28:51   5   it's a material violation or whether we would do
03:28:53   6   anything about it, you know, obviously would
03:28:55   7   depend upon the, you know, the facts and the, and
03:28:58   8   the circumstances and the magnitude of the, of the
03:29:01   9   violation.
03:29:01  10       Q   At what point does it become material,
03:29:03  11   in your judgment?
03:29:05  12       A   That's, you know, kind of fact and
03:29:07  13   circumstance-based, and, you know, it would depend
03:29:11  14   on the holistic, holistic, holistic thing of
03:29:14  15   what's going on.
03:29:15  16       Q   Aren't loan pools traded like
03:29:17  17   commodities?
03:29:18  18       A   I, I don't know.
03:29:20  19       Q   Do you think there's any particular
03:29:22  20   customer relationship that Kanas and Bohlsen are
03:29:25  21   involved in with any of the customers whose loans
03:29:27  22   show up in a loan pool like that?
```

Page 247

```
03:29:29   1       A   There could be.
03:29:31   2       Q   Think so?
03:29:31   3       A   There could be, depending upon the, the
03:29:33   4   nature of the, of the loans.
03:29:46   5       Q   Does it matter to you whether Capital
03:29:48   6   One was in competition for acquiring that
03:29:50   7   particular secondary loan package?
03:29:52   8       A   No.
03:29:55   9       Q   Does it matter to you whether Kanas and
03:29:56  10   Bohlsen had any personal role in connection with
03:30:00  11   negotiating the acquisition of that loan package?
03:30:04  12       A   No.
03:30:05  13       Q   Or reviewing the loans that were in the
03:30:06  14   package before making a bid?
03:30:08  15       A   No.
03:30:11  16       Q   So they could have had no involvement
03:30:13  17   personally whatsoever in the acquisition of the
03:30:16  18   loan pool, but you would still believe
03:30:18  19   BankUnited's acquisition of the secondary mortgage
03:30:21  20   loan pool would violate the covenant?
03:30:24  21           MR. SNYDER:  Objection to the extent
03:30:24  22       you're asking a factual as opposed to a
```

Page 248

```
03:30:26   1       hypothetical question.  Objection on the
03:30:28   2       ground that it lacks foundation.
03:30:30   3           You may answer.
03:30:31   4           THE WITNESS:  Okay.  Again, as I said,
03:30:34   5       you know, in their capacity as officers and
03:30:37   6       directors of the institution, the provision
03:30:39   7       was intended to prohibit them from getting in
03:30:41   8       the business of managing a bank that is
03:30:45   9       active in the business of commercial and
03:30:49  10       consumer banking in the tri-state area.
03:30:51  11   BY MR. SINGER:
03:30:51  12       Q   What interest of Capital One is
03:30:53  13   implicated by BankUnited's acquisition of a loan
03:30:57  14   pool that has certain of the loans in the
03:30:59  15   tri-state area as opposed to other states?
03:31:03  16       A   Other states are outside of the scope of
03:31:04  17   the, of the noncompete.
03:31:06  18       Q   Well, what interest of Capital One is
03:31:10  19   implicated by the fact that certain of the loans
03:31:12  20   are in the tri-state area?
03:31:15  21       A   If it's within the scope of the
03:31:17  22   noncompete, it's the benefit of the bargain that,
```

Page 249

```
03:31:19   1   you know, we negotiated in good faith with
03:31:21   2   Mr. Kanas and Mr. Bohlsen, that we paid a lot of
03:31:25   3   good money both for the franchise itself as well
03:31:28   4   as good money to them personally to abide by their
03:31:33   5   noncompete, and that's what we would expect them
03:31:35   6   to do.
03:31:36   7       Q   Is Capital One affected by the fact that
03:31:39   8   such a loan pool is bought by BankUnited as
03:31:46   9   opposed to CitiBank?
03:31:47  10       A   They could be.  It's one more
03:31:48  11   competitor.
03:31:50  12       Q   I'm not sure I understand it.  How is
03:31:51  13   Capital One's interest implicated by BankUnited
03:31:54  14   owning a loan pool as opposed to CitiBank, which
03:31:57  15   is here in the tri-state area, or Bank of America
03:32:00  16   or any one of the 50 other banks in the tri-state
03:32:03  17   area?
03:32:04  18       A   I'm not sure I understand your question.
03:32:05  19       Q   You understand that loan pools such as
03:32:07  20   this could be acquired without any say-so by
03:32:13  21   Capital One, by any number of banks that have very
03:32:17  22   active businesses in the tri-state area, such as
```

Page 282

```
04:05:31   1   BY MR. SINGER:
04:05:31   2     Q   I didn't ask about accountability. I
04:05:33   3   asked about participation.
04:05:35   4         Do you have to personally participate in
04:05:37   5   the activities of all of those hundreds of
04:05:41   6   subsidiaries of Capital One?
04:05:43   7         MR. SNYDER: Objection. Vague and
04:05:43   8   ambiguous.
04:05:44   9         You can answer.
04:05:45  10         THE WITNESS: Yeah, I don't know what
04:05:46  11   you mean by "personal activities," but
04:05:48  12   obviously it takes a large number of people
04:05:50  13   to run a complex organization, so there are
04:05:54  14   lots of things that I don't personally engage
04:05:58  15   in.
04:05:58  16   BY MR. SINGER:
04:06:00  17     Q   There are probably subsidiaries of
04:06:02  18   Capital One that you wouldn't even recognize if
04:06:05  19   the name was mentioned to you?
04:06:08  20     A   Possibly.
04:06:09  21     Q   And there's certainly subsidiaries of
04:06:12  22   Capital One where you haven't personally provided
```

Page 283

```
04:06:14   1   any services to that subsidiary?
04:06:16   2         MR. SNYDER: Objection. Lacks
04:06:16   3   foundation.
04:06:18   4         You can answer.
04:06:19   5         THE WITNESS: Yeah, you know, I wouldn't
04:06:21   6   know, but since I'm corporate secretary, I
04:06:24   7   probably have responsibility, have
04:06:25   8   responsibilities for ensuring the
04:06:28   9   separateness of all of those institutions,
04:06:29  10   either directly or not very many layers down
04:06:32  11   below, and I take steps to make sure that
04:06:35  12   that's all done appropriately.
04:06:36  13         So I think in my case I actually do
04:06:41  14   provide services at some level for all those
04:06:44  15   subsidiaries.
04:06:45  16   BY MR. SINGER:
04:06:45  17     Q   And that service is to make sure that
04:06:52  18   the subsidiaries are maintained as separate
04:06:52  19   corporate entities?
04:06:52  20         Those are services that you take to
04:06:54  21   maintain the separate corporate identity of those
04:06:58  22   different subsidiaries?
```

Page 284

```
04:06:59   1         MR. SNYDER: Objection. Misstates prior
04:07:01   2   testimony.
04:07:01   3         You can answer.
04:07:04   4         THE WITNESS: I'm sorry. Could you
04:07:04   5   repeat the question please.
04:07:05   6   BY MR. SINGER:
04:07:06   7     Q   What is the nature of the services you
04:07:08   8   provide to all these subsidiaries?
04:07:11   9     A   That's way too broad of a question. I
04:07:13  10   mean we've got lots of subsidiaries. It differs
04:07:16  11   depending upon the subsidiary.
04:07:17  12     Q   But you believe you provide services
04:07:19  13   personally to each one of those hundreds of
04:07:21  14   subsidiaries?
04:07:22  15     A   At some level, to the extent that I'm
04:07:24  16   corporate secretary, to the extent that I'm
04:07:25  17   responsible for the provision of legal services,
04:07:27  18   to the extent any of them need it, you know, I am
04:07:30  19   accountable for making sure that services are
04:07:32  20   provided to all of those companies, and I may very
04:07:36  21   well provide services. I sign a lot of documents,
04:07:38  22   you know, and ask a lot of questions before I sign
```

Page 285

```
04:07:41   1   a lot of documents related to the subsidiaries.
04:07:55   2     Q   Can you explain any way in which Capital
04:07:57   3   One's business is impacted by Herald National Bank
04:08:01   4   branches being managed as part of BankUnited
04:08:07   5   between, let's say, now and August of 2012 as
04:08:09   6   opposed to being part of Herald National Bank?
04:08:16   7     A   They're directly competing in the same
04:08:17   8   market, in the very business that this noncompete
04:08:20   9   was designed to prohibit Mr. Kanas and Mr. Bohlsen
04:08:24  10   from having any responsibility for. The plain
04:08:28  11   language of the agreement covers the Herald
04:08:31  12   National example. It does not fit within the
04:08:34  13   exception of exception 2 for the reasons that I
04:08:36  14   stated earlier.
04:08:39  15         They cannot wall themselves off, and
04:08:41  16   based on my own experience with how they ran their
04:08:46  17   institutions before and how Mr. Singh, you know,
04:08:53  18   worked with them, I don't believe for an instant
04:08:56  19   that Mr. Kanas and Mr. Bohlsen are going to be
04:08:59  20   ring-fenced from activities of Herald National.
04:09:02  21     Q   You raised Mr. Singh.
04:09:05  22         Mr. Singh used to work for Capital One;
```

72 (Pages 282 to 285)

Page 286

| | | |
|---|---|---|
| 04:09:07 | 1 | is that correct? |
| 04:09:08 | 2 | A   Yes, he did. |
| 04:09:09 | 3 | Q   What was his position? |
| 04:09:10 | 4 | A   You know, I'm not even sure, to be quite |
| 04:09:12 | 5 | honest.  I know that he was -- he ended up being |
| 04:09:13 | 6 | with us for a relatively short time.  I don't know |
| 04:09:16 | 7 | whether he ended up in our, you know, corporate |
| 04:09:18 | 8 | development group or whether he was working for, |
| 04:09:21 | 9 | you know, the Kanas and Bohlsen in some capacity |
| 04:09:24 | 10 | in the, you know, the bank. |
| 04:09:25 | 11 | Q   Did he have access to confidential |
| 04:09:27 | 12 | information of Capital One? |
| 04:09:28 | 13 | A   I believe he did. |
| | 14 | [redacted] |
| | 15 | [redacted] |
| | 16 | [redacted] |
| 04:09:53 | 17 | Q   Do you believe that BankUnited's |
| 04:09:55 | 18 | considering the placing of a bid on a portfolio |
| 04:09:57 | 19 | for the Bank of Ireland, even if they ultimately |
| 04:10:01 | 20 | never placed a bid, constitutes a violation of |
| 04:10:04 | 21 | Kanas and Bohlsen's covenant? |
| 04:10:07 | 22 |        MR. SNYDER:  Objection.  Lacks |

Page 287

| | | |
|---|---|---|
| 04:10:07 | 1 | foundation. |
| 04:10:07 | 2 |        You can answer. |
| 04:10:08 | 3 |        THE WITNESS:  I don't know.  I don't |
| 04:10:08 | 4 | know what you mean by the word "considering." |
| 04:10:11 | 5 | If they are engaged actively in attempts, |
| 04:10:14 | 6 | conversations or, you know, other efforts to |
| 04:10:17 | 7 | acquire banking assets in New York, that's |
| 04:10:22 | 8 | engaged in the business of acquiring |
| 04:10:24 | 9 | commercial and banking products.  It's not |
| 04:10:26 | 10 | just -- |
| 04:10:27 | 11 | BY MR. SINGER: |
| 04:10:27 | 12 | Q   So -- |
| 04:10:27 | 13 | A   You know, if they're successful, it's |
| 04:10:29 | 14 | all of the activities that lead up to that, you |
| 04:10:32 | 15 | know, conversations, planning, preparation, bids, |
| 04:10:36 | 16 | if there was such a bid, you know, talking with |
| 04:10:39 | 17 | the principals on the other side, engaging with |
| 04:10:42 | 18 | investment banks or other agents who may be |
| 04:10:45 | 19 | involved in the, you know, in the, in the sale of |
| 04:10:47 | 20 | those, those activities. |
| 04:10:49 | 21 |        All of those activities constitute the |
| 04:10:52 | 22 | business of acquiring and managing commercial and |

Page 288

| | | |
|---|---|---|
| 04:10:55 | 1 | consumer banking products in New York. |
| 04:10:57 | 2 | BY MR. SINGER: |
| 04:10:57 | 3 | Q   And so that would violate the covenant |
| 04:10:59 | 4 | even if Kanas and Bohlsen -- |
| 04:11:02 | 5 | A   That's correct. |
| 04:11:02 | 6 | Q   -- and BankUnited decide not to place a |
| 04:11:05 | 7 | bid -- |
| 04:11:05 | 8 | A   That's correct. |
| 04:11:06 | 9 | Q   -- on those assets? |
| 04:11:07 | 10 | A   That's correct. |
| 04:11:22 | 11 | Q   Let's talk for a few moments about the |
| 04:11:24 | 12 | level of association with BankUnited, or not |
| 04:11:26 | 13 | BankUnited but a competitive business as it's |
| 04:11:28 | 14 | defined in the agreement. |
| 04:11:30 | 15 |        MR. SNYDER:  I just want to make clear |
| 04:11:31 | 16 | that -- we can do it on the record or off the |
| 04:11:35 | 17 | record -- that these are all 30(b)(6) |
| 04:11:37 | 18 | questions as I understand that you're |
| 04:11:40 | 19 | intending to address to Mike Slocum.  Is |
| 04:11:44 | 20 | that -- I just want to make sure that -- |
| 04:11:46 | 21 |        MR. SINGER:  I'm not sure where these |
| 04:11:47 | 22 | fit between personal -- let me finish -- |

Page 289

| | | |
|---|---|---|
| 04:11:51 | 1 | between personal answers of the witness as |
| 04:11:55 | 2 | someone who is an officer of Capital One and |
| 04:11:57 | 3 | someone who personally negotiated this |
| 04:11:58 | 4 | agreement, and where -- whether they fall |
| 04:12:03 | 5 | into one or more categories of 30(b)(6). |
| 04:12:04 | 6 |        I do acknowledge that, I think it was at |
| 04:12:07 | 7 | lunchtime, that Mr. Hogan informed me that |
| 04:12:11 | 8 | the last topic of the 30(b)(6), which I think |
| 04:12:14 | 9 | deals with violations of the covenant by the |
| 04:12:18 | 10 | defendants would be treated by Mr. Slocum |
| 04:12:20 | 11 | rather than by Mr. Finneran. |
| 04:12:23 | 12 |        MR. SNYDER:  Right.  Mr. Slocum is the |
| 04:12:24 | 13 | business person who had knowledge of the |
| 04:12:28 | 14 | business as the company representative, and |
| 04:12:32 | 15 | obviously Mr. Finneran is the general |
| 04:12:33 | 16 | counsel, not involved in the daily operations |
| 04:12:35 | 17 | of the business.  So it sounds to me that |
| 04:12:38 | 18 | you're, you're asking 30(b)(6) type |
| 04:12:40 | 19 | questions, and I just want to, if you are -- |
| 04:12:44 | 20 |        MR. SINGER:  I, I, I don't think I need |
| 04:12:45 | 21 | to repeat again, but I think I made clear, |
| 04:12:48 | 22 | I'm asking questions of this witness.  To the |

Page 306

Page 308

Page 307

```
04:42:01   4   BY MR. SINGER:
04:42:02   5     Q  I'm asking: As you sit here today, do
04:42:05   6   you believe Mr. Kanas is honest?
04:42:06   7     A  You know, I have not had any dealings
04:42:07   8   with Mr. Kanas for a long time. At the, at the
04:42:09   9   time I thought, you know, at the time, and when I
04:42:12  10   wrote this and the way we were, you know, we were
04:42:15  11   engaging in, you know, trying to accommodate his
04:42:20  12   wishes to leave and to also leave the business in
04:42:23  13   a, you know, in as good a position we could to
04:42:28  14   ensure its future success, you know, he was
04:42:31  15   treating it with the respect that, you know, I, I
04:42:34  16   would expect.
04:42:37  17         You know, I think that, you know, some
04:42:39  18   of the activities that we're, you know, involved
04:42:41  19   in right now is -- probably has me questioning
04:42:45  20   some of John's motives and, and integrity because
04:42:50  21   of all the matters that we've laid out in the
04:42:52  22   complaint.
```

Page 309



Page 310

[redacted]

Page 311

[redacted]

Page 312

[redacted]

Page 313

[redacted]

```
                                            Page 350
  1           E R R A T A  S H E E T
  2   IN RE:  CAPITAL ONE VS. KANAS AND BOHLSEN
  3   RETURN BY:
  4   PAGE   LINE        CORRECTION AND REASON
  5   ____   ____   _____
  6   ____   ____   _____
  7   ____   ____   _____
  8   ____   ____   _____
  9   ____   ____   _____
 10   ____   ____   _____
 11   ____   ____   _____
 12   ____   ____   _____
 13   ____   ____   _____
 14   ____   ____   _____
 15   ____   ____   _____
 16   ____   ____   _____
 17   ____   ____   _____
 18   ____   ____   _____
 19   ____   ____   _____
 20   ____   ____   _____
 21   _____   _____
 22   (DATE)       (SIGNATURE)
```

```
                                            Page 351
  1
  2
  3
  4   CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC
  5        I, Laurie Bangart-Smith, Registered
       Professional Reporter, the officer before
  6    whom the foregoing deposition was taken, do
       hereby certify that the foregoing transcript
  7    is a true and correct record of the testimony
       given; that said testimony was taken by me
  8    stenographically and thereafter reduced to
       typewriting under my supervision; and that I
  9    am neither counsel for, related to, nor
       employed by any of the parties to this case
 10    and have no interest, financial or otherwise,
       in its outcome.
 11
           IN WITNESS WHEREOF, I have hereunto set
 12    my hand and affixed my notarial seal this
       13th day of February, 2012.
 13
 14    My commission expires:  March 14, 2016
 15
 16
 17    _____
 18    LAURIE BANGART-SMITH
       NOTARY PUBLIC IN AND FOR
 19    THE DISTRICT OF COLUMBIA
 20
 21
 22
```