EXHIBIT #4

(Redacted Exhibit)

Singer Declaration

Page 1

1            IN THE UNITED STATES DISTRICT COURT
2              FOR THE EASTERN DISTRICT OF VIRGINIA
3                     ALEXANDRIA DIVISION
4
5   Capital One Financial            Civil Action No.
6   Corporation,                     1:11-CV-750(LO/TRJ)
7          Plaintiff,
8   vs.
9   John A. Kanas
10  and
11  John Bohlsen,
12         Defendants.
13  _____/
14
15    HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
16
17                DEPOSITION OF LYNN CARTER
18
19                   January 26, 2012
20
21
22
23
24
25

Page 106

1   And these were actually banks --

Page 107

2       MR. SIRES:  So, why don't we take a break.
3   It's been about an hour and the tape is running out.
4       THE WITNESS:  Okay.
5       THE VIDEOGRAPHER:  This is the end of tape
6   number 1 in the deposition of Lynn Carter.  Going
7   off the record.  The time is 11:14 a.m.
8       (Recess had.)
9       THE VIDEOGRAPHER:  This marks the
10  beginning of tape number 2 in the deposition of
11  Lynn Carter which is being taken at 333 Madonna Road
12  in San Luis Obispo, California.  The videographer is
13  Jenny Estes here on behalf of Magna Legal Services
14  located in New York.  Back on the record.  The time
15  is 11:30 a.m.
16      MR. SIRES:  If I might, can you mark that
17  as Exhibit 1, please.
18      (DEFENSE EXHIBIT 1, MARKED.)
19  BY MR. SIRES:
20   Q.  Ms. Carter, we are going to be marking
21  some documents during the course of the deposition,
22  and the process is going to be just what's happening
23  now.  I will give the court reporter one, she'll put
24  a yellow sticker on it with a number, give your
25  counsel another copy.  And you will have a chance to

Page 108

1   read every document as thoroughly as you want before
2   you answer any questions about it.

Page 109

Page 110

Page 111

Page 112

25   Q.   Now, when you went to Capital One in May

Page 113

1  of 2007, you went with the understanding that you
2  would be the chief operating officer?
3      A.  From May of 2007 until April of 2008, yes.
4      Q.  That was your -- was that your expectation
5  at that point?
6      A.  It was in the offer letter.
7      Q.  And as the chief operating officer, you
8  were the chief officer in charge of operating what?
9      A.  It's a great question.  That was going to
10 be defined by John Kanas and myself, because I was
11 working directly for John.
12     Q.  And at that point, Mr. Kanas had what
13 title?
14     A.  He was, I believe, president of.
15     Q.  Of?
16     A.  The bank.
17     Q.  So Capital One Bank?
18     A.  Yeah.  There's a legal entity, CONA,
19 C-O-N-A, Capital One NA, I'm not sure he was
20 president of that, but he was president of the
21 banking business, yes.
22     Q.  So to the extent that --
23     A.  And he was a Board member.
24     Q.  To the extent that Capital One was an
25 entity then, and we discussed how it was a credit

Page 114

1  card --
2  A.  Yes.
3  Q.  -- issuer --
4  A.  Yes.
5  Q.  -- and acquired banks, Mr. Kanas was in
6  charge of the banking business of Capital One,
7  correct?
8  A.  Correct.
9  Q.  And you came in essentially as second in
10 command to him, correct?
11 A.  Correct.
12 Q.  With the expectation that within a year,
13 you would accede to his position and become head of
14 the banking business of Capital One, correct?
15 A.  Yes.
16 Q.  And that, in fact, happened in 2007,
17 earlier than you expected, correct?
18 A.  It did.
19 Q.  Now, are you aware of any information that
20 was available to Mr. Kanas while you were his chief
21 operating officer that was not available to you
22 about Capital One?
23 A.  I wouldn't know.
24 Q.  Do you know -- I take it you don't know of
25 any information that they said, this is available to

Page 115

1  you, but don't make it available to Lynn?
2  A.  I don't know.
3  Q.  And once you succeeded him -- and was that
4  in July of 2007?
5  A.  August of 2007.
6  Q.  August?
7  A.  Yes.
8  Q.  So when you succeeded him in August of
9  2007, were there any duties that he was performing
10 as president of the bank that you were not given to
11 take over?
12     MR. HOGAN:  Objection to form.
13 BY MR. SIRES:
14 Q.  Let me rephrase it.
15     When Mr. Kanas left the presidency of the
16 bank and you succeeded to that position, was there
17 any change to the duties of the position?
18 A.  Yes.
19 Q.  And what were those?
20 A.  You mean -- clarification, please.  Change
21 in regards to what John did versus what I was doing?
22 Q.  Yes.
23 A.  Before August of 2007 --
24 Q.  No.
25 A.  -- or as president?

Page 116

1  Q.  Right, as president.  So let me rephrase
2  the question, because I'm going to ask you the other
3  question in any event.  Let me ask the other
4  question first.
5  A.  Okay.
6  Q.  You went from being COO to president in
7  August of 2007.  How did your duties change as a
8  result of making that position change?
9  A.  I was directly responsible to
10 Rich Fairbank for the banking business.  I became
11 president of the legal entity Capital One NA and all
12 the responsibilities that come with being the senior
13 executive accountable for a legal entity.
14     And being a chief operating -- I'd been in
15 the job 60 days, so the role was being defined by
16 John and myself of really what he wanted me to do
17 versus what he was going to do.  So it was in the
18 very beginning stages of the relationship.
19 Q.  Had there been any sort of delineation
20 between the two jobs up until the time you assumed
21 Mr. Kanas's old job?
22 A.  Delineation.  John's familiarity with the
23 organization he built clearly had impact on the
24 things that he was engaged in with the existing
25 customer base and all that, but he was trying to

Page 117

1  introduce me and get me involved in all of that.
2      I think the thing that John was really
3  trying to sort out, conversations we directly had,
4  were specifically around the operations integration.
5  We didn't have the right team to do that work, and
6  he was concerned about that, so he asked me to get
7  more actively involved in that.
8  Q.  What's operations integration mean?
9  A.  We needed to integrate Hibernia and North
10 Fork Banks, their systems, their products.
11 Q.  Everything from computers to what kind of
12 loan products are offered --
13 A.  Products are offered, correct.
14 Q.  -- to consumers.  So you were told by
15 Mr. Kanas to become particularly involved in that
16 as your --
17 A.  To get more engaged in that --
18 Q.  -- position allowed?
19 A.  -- work, yes.
20 Q.  Now, when you assumed the position of
21 president in August of 2007, were your duties the
22 same as those that Mr. Kanas had while he had been
23 president?
24 A.  To the best of my knowledge, yes.
25 Q.  I want to go back a little and ask you

Magna Legal Services

Page 266



Page 267



7  MR. SIRES: Thank you. Change the tape.
8  THE VIDEOGRAPHER: This is the end of tape
9  number 3 in the deposition of Lynn Carter. Going
10 off the record. The time is 3:58 p.m.
11     (Recess had.)
12     THE VIDEOGRAPHER: This marks the
13 beginning of tape number 4 in the deposition of
14 Lynn Carter which is being taken at 333 Madonna Road
15 in San Luis Obispo, California. The videographer is
16 Jenny Estes here on behalf of Magna Legal Services
17 in New York. Back on the record. The time is
18 4:18 p.m.
19 BY MR. SIRES:
20    Q.  Ms. Carter, welcome back.
21    A.  Thank you.
22    Q.  And, now, do you know whether BankUnited
23 has loans secured by mortgages on New York,
24 New Jersey or Connecticut real property?
25    A.  I personally do not know that.

Page 268

1    Q.  Do you know whether BankUnited has
2 acquired any loans secured by mortgages on property
3 in New York, New Jersey, or Connecticut at any time
4 in the secondary loan market?
5    A.  I don't know that.
6    Q.  Is it your view that if it turned out to
7 be that BankUnited had some loans in its portfolio
8 that were secured by mortgages on New York, New
9 Jersey, or Connecticut real property that were
10 acquired either as a result of the acquisition of
11 BankUnited FSB or through the secondary loan market,
12 that that would have a competitive impact on Capital
13 One?
14     MR. HOGAN: Objection to form; incomplete
15 hypothetical, and object to the extent it calls for
16 a legal conclusion.
17     THE WITNESS: I'm not a lawyer so it's
18 probably inappropriate for me to respond.
19 BY MR. SIRES:
20    Q.  I'm not asking you as a lawyer. I'm
21 asking you as a banker. And we talked about how
22 Capital One has become bigger and more diversified.
23 And because you don't know for a fact that
24 Capital -- that BankUnited has or does not have
25 loans and is secured by mortgages in what I call the

Page 269

1 tri-state area, meaning New York, New Jersey,
2 Connecticut, I can't ask you about those facts. So
3 I'm going to ask you whether as a banker, if it were
4 shown that BankUnited had some loans that were
5 secured by mortgages in the tri-state area while
6 still running the core of its business in Florida
7 with its Florida branches, whether you would view
8 that as having an actual competitive impact on
9 Capital One?
10     MR. HOGAN: Same set of the objections as
11 I recited before.
12     THE WITNESS: So I would respond to your
13 question in two buckets, if I may.
14 BY MR. SIRES:
15    Q.  Sure.
16    A.  If there are consumer mortgage notes in
17 BankUnited's portfolio that was part of their
18 portfolio pre-acquisition, and they aren't
19 proactively marketing to those customers for more
20 business, and it's just a matter of them servicing
21 the loans --
22    Q.  Correct.
23    A.  I would, I would say there's no proactive
24 activity to grow the business in New York through
25 those customers. That's the first bucket.

Page 270

1  Q. Right.
2  A. The second bucket is if they acquired
3  loans since the acquisition and proactively acquired
4  those loans from clients who lived in New York, New
5  Jersey, and Connecticut, that means that's business
6  potentially that we could be getting that we're not
7  getting. And, if, in fact, they are limited in
8  their ability to compete, then that affects our
9  business.
10  Q. Let me add a third bucket, then.
11  A. Okay.
12  Q. Loans secured by mortgages in a tri-state
13  area that were acquired by means of purchasing
14  portfolio loans on the secondary loan market, loans
15  that were originated by others, would you consider
16  that to be a competitive activity vis-à-vis Cap One?
17       MR. HOGAN: Object to form; incomplete
18  hypothetical, and object to the extent it calls for
19  a legal conclusion.
20       THE WITNESS: My response to that would be
21  that there's 50 great states in the United States of
22  America, and there's lots of options to acquire
23  portfolios that would not include New York, New
24  Jersey and Connecticut, wouldn't be necessary to
25  include New York, New Jersey and Connecticut, but I

Page 271

1  don't know how the secondary market works and how
2  you can screen for that.
3  BY MR. SIRES:
4  Q. I appreciate your answer, but I'm going
5  back to the question that assuming that however the
6  secondary market works, they had some loans that
7  were part of a larger loan portfolio --
8  A. Right.
9  Q. -- that were already made or originated,
10  and that were sold as part of loan portfolios on the
11  secondary market, which you know exists, but which I
12  know you don't --
13  A. Right.
14  Q. -- participate in --
15  A. Right.
16  Q. -- personally?
17  A. Right.
18  Q. Would you view that as a competitive act
19  vis-à-vis Cap One?
20       MR. HOGAN: Objection to form, incomplete
21  hypothetical, and object to the extent it calls for
22  a legal conclusion.
23       THE WITNESS: So again, if it was in
24  BankUnited's portfolio prior to the acquisition of
25  BankUnited, I view that as a very different issue

Page 272

1  than if they acquired it proactively after the fact.
2  Q. Even if they didn't originate the loan?
3  A. Correct.
4  Q. If they acquired it as a secondary market
5  component?
6  A. Because it's a customer that they can
7  market to. It's in their portfolio.
8  Q. Now, again, you -- and I know I've asked
9  you this before, but just want to make it clear.
10  You don't know of any instance in where there's been
11  any business, any customer or any piece of banking
12  business that has been lost by Capital One as a
13  result of anything that Mr. Kanas or Mr. Bohlsen
14  have done, correct?
15       MR. HOGAN: Objection; asked and answered.
16       THE WITNESS: Specifically no, because I
17  don't know who BankUnited's customers are.
18  BY MR. SIRES:
19  Q. But generally, even, correct?
20  A. No, I don't.
21  Q. And let me just give you by way of
22  example, although I think we covered this already.
23  You don't have to know who BankUnited's customers
24  are. You could say, for example, that you know that
25  customer X shut their bank account after being with

Page 273

1  you guys for ten years or five years --
2  A. Um-hmm.
3  Q. -- and you called the president and said,
4  hey, why did you close out your account, and he
5  said, well, we moved to BankUnited. So there's all
6  sorts of ways that you could know that. And I just
7  want to know whether, I want to confirm that you're
8  not aware of any such --
9  A. I've not --
10  Q. -- instance?
11  A. No, I've not had any of those kinds of
12  discussions.
13  Q. Any discussion, or any information from
14  whomever that would indicate to you that a bank one
15  customer has --
16  A. Capital One.
17  Q. -- Capital One customer -- let me rephrase
18  that.
19       You've had no, you have no knowledge
20  firsthand or secondhand that a Capital One customer
21  has taken business away from Capital One and given
22  it to BankUnited by any reason of anything that John
23  Kanas or John Bohlsen have done, correct?
24       MR. HOGAN: Objection to form.
25       THE WITNESS: I personally have no

Page 286

[redacted]

Page 287

[redacted]

Page 288

2   Q.   Correct.
3        Do you recall whether there was any
4   response to this information that there was a intent
5   by BankUnited to come into Manhattan at a future
6   time as reflected in this article which is part of
7   Exhibit 15?
8   A.   I believe Mr. Kanas has been very public
9   about wanting to come back to Manhattan when he
10  could.
11  Q.   And that's a fact that's well known in the
12  bank, right, Capital One?
13  A.   Due to all the press coverage Mr. Kanas
14  gets, yes.
15  Q.   And he's not ever hidden the fact that he
16  wants to come back into Manhattan, correct, or
17  New York, I should say?
18  A.   New York, yeah.
19  Q.   That's not been a secret, correct?
20  A.   No.
21  Q.   He's told you that, correct?
22  A.   I don't know if he's told me directly,
23  but --
24  Q.   It's an accepted fact?
25  A.   It's an accepted fact.

Page 289

1   Q.   And it has been since essentially he left
2   Cap One, correct?
3   A.   Not necessarily.
4   Q.   When do you think it became sort of an
5   accepted fact that he wanted to go back into
6   New York?
7   A.   After the acquisition of BankUnited.
8   Q.   And certainly he's been very public.
9   A.   Yes.
10  Q.   You've read media articles to that effect,
11  right?
12  A.   That's my point, yes.
13  Q.   Now, you don't recall reading a single
14  media article, do you, Ms. Carter, that said he
15  intended to open up BankUnited branches in New York
16  or Connecticut or New Jersey prior to the expiration
17  of his noncompete, correct?
18  A.   I have never seen that.
19  Q.   In fact, you recall that in many if not
20  all of the articles he makes mention that his plans
21  are to compete after the expiration of his
22  noncompete, correct?
23  A.   Yes.
24  Q.   Don't worry.  I'm not going to ask you
25  about all these.

Page 338

```
 1        THE REPORTER:  Okay.
 2        MR. SIRES:  So that it's obvious to
 3   whoever sees it.
 4        Thank you again.  And I think we're off
 5   the record.
 6        THE VIDEOGRAPHER:  This concludes today's
 7   deposition of Lynn Carter.  The number of tapes used
 8   was four.  Going off the record.  The time is
 9   6:02 p.m.
10        (Signature having not been waived,
11   Volume I of the videotaped deposition of LYNN CARTER
12   was concluded at:  6:02 p.m.)
13                  --o0o--
14        ACKNOWLEDGEMENT OF WITNESS
15        I, LYNN CARTER, do hereby acknowledge that
16   I have read and examined the foregoing testimony,
17   and the same is a true, correct and complete
18   transcription of the testimony given by me, and any
19   corrections appear on the attached Errata sheet
20   signed by me.
21
22
23
24
     Date:_____  _____
25            LYNN CARTER
```

Page 339

```
 1        E R R A T A  S H E E T
 2
 3   PAGE  LINE        CORRECTION AND REASON
 4   ____  ____  _____
 5   ____  ____  _____
 ...
```

Page 340

```
 1        E R R A T A  S H E E T
 2
 3   PAGE  LINE        CORRECTION AND REASON
 4   ____  ____  _____
 ...
```

Page 341

```
 1        R E P O R T E R' S   C E R T I F I C A T E
 2
 3        I, PATRICIA GOULET, a Certified Shorthand
 4   Reporter in and for the State of California, hereby
 5   certify that the witness in the foregoing deposition
 6              LYNN CARTER
 7   was by me duly administered an oath to tell the
 8   truth, the whole truth and nothing but the truth in
 9   the within-entitled cause,and that the foregoing is a
10   full, true and complete transcript of the proceedings
11   had at the taking of said deposition, reported to the
12   best of my ability and transcribed under my
13   direction.
14        I further certify that I am not of counsel
15   or attorney for either/or any of the parties to the
16   said deposition, nor in any way interested in the
17   event of this cause, and that I am not related to any
18   of the parties thereto.
19
20
21
22
23   Date: January 31, 2012  _____
                 PATRICIA GOULET,
24               CSR Number 8315
25
```