UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| CAPITAL ONE<br>FINANCIAL CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>JOHN A. KANAS and<br>JOHN BOHLSEN,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No.: 1:11-cv-750 |

## MEMORANDUM OPINION

This matter comes before the Court on Defendants John A. Kanas and John Bohlsen's

Motion for Summary Judgment (Dkt. No. 82). Defendants ask the Court to void the non-compete

agreement they entered into with their former employer, Capital One. In the alternative,

Defendants request partial summary judgment with regard to their breach of the non-compete

agreement and for the Court to strike Plaintiff's request for relief in the form of disgorgement.

For the reasons that follow, the Court DENIES Defendants' Motion but reserves judgment on

Defendants' alternative requests.

## BACKGROUND

Defendants John Kanas and John Bohlsen were executives of North Fork Bancorporation,

Inc. ("North Fork"), a bank holding company, and its wholly owned subsidiary North Fork Bank,

for some thirty years. North Fork Bank offered banking products and services through a network

of over 350 branches, mostly in the New York Metropolitan Area. Kanas and Bohlsen managed

North Fork Bank as it grew from a small local bank to a large, efficient, and profitable financial

institution.

1

In 2006, Capital One Financial Corporation ("Capital One") acquired North Fork in a transaction valued at approximately $13.2 billion. As of the merger, Kanas was President, Chief Executive Officer, and Chairman of the Board of Directors of North Fork. Kanas held the position of President of North Fork Bank for nearly 30 years and Bohlsen had served on the North Fork Board of Directors as Vice Chairman for approximately 15 years. Each Defendant held less than 1% of North Fork's outstanding shares.

On March 12, 2006, Kanas and Bohlsen each executed a Restricted Share Agreement ("RSA") with Capital One that was contingent upon the merger's consummation and the Defendants' transfer of their respective 1% interests in North Fork to Capital One. Under the RSA, the Defendants were entitled to receive additional compensation ($24 million in restricted shares of Capital One common stock to Kanas, $18 million to Bohlsen) if (1) the $13.2 billion acquisition closed, and (2) the Defendants remained employed by Capital One for a period of three years after the date of the merger. The RSA contained a covenant restricting Defendants from engaging in a competitive business for five years after ending their employment with Capital One. The geographic areas covered by the RSA varied by the competitive business involved; most were national in scope.

The merger closed in December 2006 and Kanas and Bohlsen became Capital One employees. However, in July 2007, Capital One and the Defendants agreed to end their employment relationship. At the time, Kanas was President of Capital One's Banking Segment, and Bohlsen was Executive Vice President of Commercial Banking. On July 9, 2007, Capital One and each Defendant executed a Separation Agreement, which superseded the RSA. As part of the Separation Agreement, Capital One agreed that Kanas and Bohlsen did not need to work for Capital One for three years for their restricted shares to vest. Under the Agreement, their

2

restricted shares vested on August 6, 2007, their final day as Capital One employees, rather than

December 2009 as proscribed by the RSA.

The Separation Agreement also superseded the RSA's noncompetition covenant. The

Separation agreement narrowed the covenant not to compete in terms of geography and the lines

of business covered. It also provided exceptions. As revised, the covenant provides that

Defendants may not "engage in a Competitive Business (whether as director, stockholder,

investor, member, partner, principal, proprietor, agent, consultant, officer, employee or

otherwise)" in New York, New Jersey, or Connecticut, subject to three exceptions:

> [I]n no event will any of the following activities constitute a breach of the Non-Competition Covenant: (i) ownership for investment purposes of not more than ten percent (10%) of the total outstanding equity securities (or other interests) of any entity; (ii) the provision of services to a corporation or other entity, a portion of the business of which is a Competitive Business, provided that the Executive is not providing services to the portion of the business which is directly engaged in a Competitive Business; or (iii) serving as a principal, partner, director, employee, consultant or advisor to a private equity firm, investment bank (but in the case of an investment bank that is part of a financial services company that also engages directly in the Competitive Business, not for the Competitive Business of that financial services company) or hedge fund, provided that such activities do not involve advising such firm, investment bank or hedge fund with respect to, or analyzing investments in, the Company or its Affiliated Entities.

For the purposes of both the prohibition and exceptions, "Competitive Business" is defined to

mean:

> the consumer and commercial banking business engaged in by the Company or any Affiliated Entity as of the Separation Date, including the business of acquiring and/or managing (whether by use of a sales force, agents, direct mail, the branch, telemarketing, the Internet or any other channel) all commercial and consumer banking products (including but not limited to, commercial and industrial loans, commercial real estate loans, middle market and small business loans, whether originated directly or indirectly through other lending institutions, and commercial and consumer deposits), in New York, New Jersey and Connecticut.

In May 2009, the Defendants and other investors formed BankUnited. BankUnited, Inc. went public in 2011 and has several subsidiaries. Kanas is Chairman of the Board and CEO of BankUnited, Inc., while Bohlsen is BankUnited, Inc.'s Chief Lending Officer and Senior Executive Vice President. Since May 2009, Kanas has served as the President and CEO of BankUnited and on May 19, 2010, Kanas was affirmed as Chairman, and Bohlsen Vice Chairman, of the Board of Directors of BankUnited. With respect to stock ownership, Kanas owns less than six percent and Bohlsen less than three percent of the stock of BankUnited, Inc.

BankUnited is a Florida Bank with all of its branches located in Florida. Capital One has no branches anywhere in Florida. The Defendants maintain that Capital One never objected to the Defendants' role at BankUnited until filing this lawsuit. Capital One argues otherwise, specifically pointing to a June 2009 meeting between Defendants and Capital One executives to express concern over Defendants' roles with BankUnited given their obligations under the Separation Agreement.[1]

BankUnited acquired mortgage loan portfolios from the FDIC and on the secondary market. Certain portions of each portfolio were secured by property in the Tri-State Area. As of December 2011, a portion of the total deposit accounts maintained at BankUnited's Florida branches were held by customers who listed a primary address in the Tri-State Area.

In October 2010, BankUnited formed a subsidiary, United Capital Business Lending, Inc. ("United Capital"), which then acquired certain assets of a company located in Maryland that engaged in making equipment loans to franchisees across the United States. Of the total outstanding loans, a portion were secured by equipment located in the Tri-State Area. United

---

[1] Kanas Dep. at 143 (Q: "And do you recall at that point Mr. Finneran reminded you of your obligations under the separation agreement as it relates to BankUnited? A: Yes."); Finneran Dep. 212 (Q: "Did you have a conversation in 2009 with John Kanas about his non-compete? A: I did . . . . [T]he conversation was with both John Kanas and John Bohlsen .").

Capital is run by its President, Bernard Lajeunesse, who reports to John Bohlsen. Bohlsen is a member of United Capital's board of directors; Kanas is not.

In June 2011, BankUnited, Inc. and Herald National—a commercial bank with all its offices in New York—entered into an agreement under which BankUnited, Inc. would acquire Herald National. The transaction closed in February 2012, after receiving approval from the Federal Reserve Bank of Atlanta and the Office of the Comptroller of the Currency. The assets of Herald National represent approximately five percent of the combined assets of BankUnited, Inc. and its subsidiaries.

BankUnited, Inc. and the Defendants implemented a ring-fencing structure for the Herald National Transaction based on the advice of counsel. The ring-fencing provides that, until the non-competes expire in August 2012, Kanas and Bohlsen will be "fenced out" of providing services to Herald National. Until then, Herald Nation will remain a separate entity and will not be merged into BankUnited, Kanas and Bohlsen will not have any decision-making authority or otherwise participate in Herald National's affairs. The Herald National board would not report to them and they would recuse themselves from any Herald National matter before the BankUnited, Inc. board. By ring-fencing, the Defendants sought to fall within the Separation Agreement's "not providing services" exception. The non-compete agreements and the proposed ring-fencing were fully disclosed to the Federal Reserve Bank and the Office of the Comptroller of the Currency during the approval process. The transaction received approval without objection to using this structure. Capital One disputes whether ring-fencing is consistent with the "not providing services" exception and whether the Defendants have, in fact, been "fenced out."

In July 2011, Capital One initiated this suit, which contains a single count for breach of the non-compete covenants.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A party moving for summary judgment has the initial burden of showing the court the basis for its motion and identifying the evidence that demonstrates the absence of a genuine issue of material fact. *Id.* Once the moving party satisfies its initial burden, the opposing party has the burden of showing, by means of affidavits or other verified evidence, that there exists a genuine dispute of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *see also Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 640 (4th Cir. 1997) ("[T]o avoid summary judgment, the non-moving party's evidence must be of sufficient quantity and quality as to establish a *genuine* issue of material fact for trial.") (emphasis in original). A dispute of material fact is genuine if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In reviewing a summary judgment motion, the court "must draw all justifiable inferences in favor of the nonmoving party. . . ." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson*, 477 U.S. at 255).

## ANALYSIS

Because covenants not to compete are disfavored as restraints of competition, once challenged, these restrictions must survive judicial scrutiny to be upheld. *See, e.g., Omniplex World Servs. Corp. v. U.S. Investigative Servs.*, 270 Va. 246, 249, 618 S.E.2d 340, 342 (2005).

Covenants not to compete will not withstand judicial scrutiny if they are found to be

unreasonable. *See, e.g., Foti v. Cook*, 220 Va. 800, 805, 263 S.E.2d 430, 433 (1980). Virginia

courts have developed two frameworks from which to analyze covenants not to compete

depending upon whether the covenant is ancillary to the sale of a business or an

employer/employee relationship. The frameworks differ in that "[t]he scope of permissible

restraint is more limited between employer and employee than between seller and buyer, and the

covenant is construed favorably to the employee." *Richardson v. Paxton Co.*, 203 Va. 790, 795,

127 S.E.2d 113, 117 (1962). Conversely, greater latitude is allowed in determining the

reasonableness of a restrictive covenant when the covenant relates to the sale of a business.

*Alston Studios, Inc. v. Lloyd V. Gress and Assocs.*, 492 F.2d 279, 284 (4th Cir. 1974). Not

surprisingly, Defendants urge the court to apply the restrictive employer/employee standard,

while Plaintiff contends that the sale-of-business framework applies.

The choice between these competing frameworks is typically clear. A covenant not to

compete cannot be ancillary to an employment relationship where there was never an

employer/employee relationship between the parties. *See, e.g., W. Insulation, L.P. v. Moore*, No.

3:05-cv-602, 2006 WL 208590, at *1, 5-6 (E.D. Va. Jan. 25, 2006), *aff'd in part, rev'd in part*,

242 F. App'x 112 (4th Cir. 2007); *Centennial Broad. v. Burns*, No. 6:06-cv-6, 2006 WL

2850640, at *2 (W.D. Va. Sept. 29, 2006). Nor can the sale-of-business framework arise without

some form of corporate transaction separate from the parties' employment relationship. *See, e.g.,*

*W. Insulation*, 2006 WL 208590, at *6 (applying the sale-of-business framework because the

case "involves a sale of a business"); *McClain & Co. v. Carucci*, No. 3:10cv65, 2011 WL

1706810, at *6 (W.D. Va. May 4, 2011) (applying the sale-of-business standard when the parties

agreed to a covenant not to compete in concert with a settlement base on claims that the

employee diverted and misappropriated funds). Perhaps because the choice is often obvious, few courts have taken time to delineate a test for situations that do not fit neatly into either category.

As described by the Plaintiff, the sale-of-business framework is generally applied to agreements with two key features. First, it applies when the agreement was drafted to permit "the owner of a business to convey its full value on its sale, by contracting not to destroy the goodwill of that business by immediate competition." 6 Williston on Contracts § 13:9 (4th ed.). Where the seller agrees to work for the buyer, non-compete agreements are governed by the sale-of-business standard if the agreement is "attributable more to the sale of goodwill than to the employment contract . . . ." Restatement (Second) of Contracts § 188 Rptr's Note b; *see Carucci*, 2011 WL 1706810, at *6 (applying the sale-of-business framework after concluding the "primary purpose" of the covenant not to compete was unrelated to employment). Second, courts will only apply the sale-of-business standard where the agreement is the product of an arms-length negotiation, between sophisticated parties of comparable bargaining power, for substantial consideration. *See Carucci*, 2011 WL 1706810, at *6.; *W. Insulation*, 2006 WL 208590, at *6; *Roto-Die Co., Inc. v. Lesser*, 899 F. Supp. 1515, 1519 (W.D. Va. 1995) (refusing to apply the sale-of-business standard due to the employee's lack of bargaining power as a minority shareholder slated for removal from the employer's board of directors). Put more concisely, before finding the less restrictive sale-of-business standard applicable, the Court must find (1) the agreement is premised more upon the sale-of-business than the employer/employee relationship, and (2) policy considerations, such as an employer's superior bargaining power, do not make the application of the less restrictive sale-of-business standard inequitable. *See Carucci*, 2011 WL 1706810, at *6 (applying the sale-of-business framework after concluding (1) the "primary purpose" was not to regulate terms of employment and (2) the agreement was the

8

result of an arms-length transaction, in which the employee was represented by counsel, valuable consideration was exchanged, and bargaining power was equally distributed).

## I.        The Employer/Employee Standard Applies to the Separation Agreement

Courts look to several factors in determining whether the contract is "attributable more to the sale of good will than to the employment practice." Restatement (Second) Contracts § 188 Rept'r Note b. Virginia courts look to the contract itself for both provisions and omissions indicative of the parties' intent to attribute the agreement to the sale of good will or employment. *C.f. Foti*, 263 S.E.2d at 433 ("A court must give effect to the intention of the parties *as expressed in the language of their contract . . . .*") (emphasis added). The explicit language of the Separation Agreement indicates its primary purpose was to govern the Plaintiff and Defendants' employment relationship, which began six months earlier when the sale of North Fork closed.[2] Beginning with its title, the Separation and Transition Advisory Services Agreement governs the separation between employee and employer, while providing for additional employment services as the separation unfolds. *See also* Separation Agreement, preamble (providing that the contract is "relat[ed] to the Executive's *separation from service . . . .*" (emphasis added)). The body of the Separation Agreement is consistent with the title and preamble: the metes and bounds of the parties' employer/employee relationship are explicitly delineated, but there is no reference to North Fork, good will, or the sale of any business.

The Separation Agreement provides, *inter alia*, that Defendants will be separated from employment with Capital One on August 6, 2007, but will continue to provide "advisory

---

[2] Plaintiff's argument that the Separation Agreement is premised upon the sale of North Fork draws primarily upon a single fact. The shares Defendants were slated to receive as consideration under the RSA were identical to that received under the Separation Agreement; the Separation Agreement merely allowed the shares to vest at an earlier date. Although the merger may have been an implicit basis for the Separation Agreement, despite their sophistication, the parties chose not to make it an explicit basis. Silent reference to a sale-of-business is insufficient when, by contrast, the Separation Agreement references the parties' employer/employee relationship explicitly and repeatedly. Consequently, the Court applies the employer/employee framework.

services" to Capital One through December 1, 2009.[3] Separation Agreement ¶¶ 1,4. Furthermore, the body of the non-compete covenant provides that the confidential information received during their "employment" is special and unique and provided to the Defendants "expressly in consideration of [their] agreement to be bound by" the RSA and Separation Agreement, which provide necessary restrictions "to prevent the use and disclosure of the Confidential Information and to otherwise protect the legitimate business interests of the Company." Separation Agreement, Annex B ¶¶ 2(a), 5. These explicit references to the Defendants' previous employment and continuing advisory relationship with Capital One stand in contrast to the Separation Agreement's silence with regard to good will, North Fork, or any sale-of-business. This is especially true in comparison to previous cases analyzing contractual provisions indicating the sale of business itself was consideration for the covenant not to compete. *Compare* Separation Agreement, Annex B ¶ 2(a) ("The Executive acknowledges and agrees that he was given . . . such Confidential Information expressly in consideration of his agreement to be bound by, among other things, the Non-Compete Covenants . . . ."), *with W. Insulation,* 2006 WL 208590, at *1 (agreeing to be bound by the non-compete provisions "[a]s consideration for and to induce [the buyer] to pay the consideration set forth in the Contribution and Sale Agreement . . . .").

Two other provisions that have guided courts to construe agreements as ancillary to the sale of a business are also absent. First, courts consider whether the non-compete period runs from the purchase or sale or the termination of employment. *See, e.g., Centennial Broad.,* 2006 WL 2850640, at *2. The parties executed the Separation Agreement on July 9, 2007, six months after the sale of North Fork closed. Instead of providing for a non-compete period beginning on

---

[3] Annex A to the Separation Agreement details the employment related services Capital One would continue to provide the Defendants, including: use of office space in Long Island and Manhattan, an administrative assistant, and business related transportation.

the date of North Fork's sale, the Separation Agreement ran from the termination of

employment. Second, courts also consider whether the covenant not to compete is a condition to

the purchase or sale. *See, e.g., id.* It is undisputed that the covenant was not a condition to the

sale of North Fork. Consequently, neither factor supports the Plaintiff's argument that the sale-

of-business standard governs. Because the plain language of the contract indicates it is more

attributable to the employer/employee relationship between the parties, the Court's analysis need

not go further. The employer/employee framework applies.

It is true that, under the second prong of analysis, policy considerations favor proceeding

under the sale-of-business framework.[4] Nonetheless, policy considerations alone cannot dictate

the applicable framework. Both prerequisites to the application of the less restrictive sale-of-

business framework must be fulfilled. The Court's conclusion that the Separation Agreement

was more attributable to the parties' relationship as employer/employee than the unmentioned

sale of North Fork is determinative. In such a circumstance, policy considerations, such as the

bargaining power of the parties, are more properly considered as part of the Court's analysis of

enforceability.

## II.     The Covenant Not to Compete is Reasonable and Enforceable

Under Virginia law, the dispositive question when reviewing non-compete agreements is

the reasonableness of the covenant. *Foti*, 263 S.E.2d at 433. A reasonable non-compete is: (1)

narrowly drawn to protect the employer's legitimate business interest, (2) not unduly

burdensome on the employee's ability to earn a livelihood, and (3) consistent with public policy.

*Modern Env'ts, Inc. v. Stinnett*, 263 Va. 491, 493, 561 S.E.2d 694, 695 (2002). These three

factors are interrelated. *Simmons v. Miller*, 261 Va. 561, 581, 544 S.E.2d 666, 677 (2001). Their

---

[4] As will be discussed *infra*, the Defendants are not the type employees Virginia courts sought to protect when developing the employee/employer standard. As is typically the case in the sale of a business, their sophistication is uncontroverted and they executed the Separation Agreement after an arms-length negotiation process.

analysis "requires consideration of the restriction in terms of function, geographic scope, and duration." *Id.* These considerations are not separate and distinct issues, as "a single consideration that is unreasonable may be reasonable as construed in light of the other two." *Cantol, Inc. v. McDaniel*, No. 2:06-cv-86, 2006 WL 1213992, at *4 (E.D. Va. Apr. 28, 2006); *Advanced Marine Enters., Inc. v. PRC, Inc.*, 256 Va. 106, 119, 501 S.E.2d 148, 155 (1998) (Keenan, J.).

The enforceability of a restrictive covenant is a matter of law. *Omniplex*, 618 S.E.2d at 342. Covenants not to compete are disfavored as restraints on trade; the employer bears the burden of proof and ambiguity in the contract is construed in favor of the employee. *Id.* No two situations leading to the execution of a non-compete agreement are the same. "Each non-competition agreement must be evaluated on its own merits, balancing the provisions of the contract with the circumstances of the businesses and employees involved." *Id.*; *Foti*, 262 S.E.2d at 433 ("We have held repeatedly that whether the restrictive covenants in an employment contract will be enforced depends upon the facts of the particular case . . . .").

### A. The Individual Circumstances of this Case Support the Court's Finding of Reasonableness; Enforcement Will Not Affect Defendants' Ability to Earn a Living or Offend Public Policy

The Virginia Supreme Court's longstanding emphasis on deciding each non-compete agreement case on its own facts is particularly important here. There is no prior case like it. The scale of the consideration received by the Defendants in return for their covenant not to compete is unprecedented. This consideration—early vesting of a collective $42 million in restricted stock—dwarfs consideration found sufficient in previous cases. *See, e.g.*, *New River Media Group, Inc. v. Knighton*, 245 Va. 367, 368, 429 S.E.2d 25, 26 (1993) (finding $2000 sufficient consideration for a one-year non-compete). Nor has a Virginia court examined a covenant between parties of comparable sophistication. Defendants were executives of a publically traded

company, responsible for growing North Fork from a small town bank to a corporate behemoth which they would sell to Capital One for $13.2 billion and net the Defendants upwards of $150 million. Beyond Kanas and Bohlsen's business sophistication, they also received the advice of counsel while negotiating the Separation Agreement. Like their clients, the Defendants' counsel was at the pinnacle of sophistication. Counsel hailed from a preeminent law firm and specialized in executive compensation. Finally, there is no debate that the Defendants, unlike the typical employee, stood "on equal footing at the bargaining table" with their employer. *Foti*, 263 S.E.2d at 433. Notably, it was the Defendants, not Capital One, who initially drafted the Separation Agreement.[5]

No Virginia case mirrors this unique scenario. However, Virginia courts have addressed the situation where the employer and employee possessed equal bargaining power on two occasions. Both occurred in the context of a partnership and both covenants were upheld by the Virginia Supreme Court. *See Foti*, 263 S.E.2d at 433; *Meissel v. Finley*, 198 Va. 577, 583-84, 95 S.E.2d 186, 191 (1956).[6] The circumstances surrounding the execution of the Separation Agreement uniformly counsel in favor of enforcement. No previous Virginia case involved

---

[5] To this Court's knowledge, the situation where the employee provided the first draft of the covenant is an issue of first impression for Virginia courts. In the opposite context, courts routinely place the burden upon the employer-drafter to provide a legitimate business interest in prohibiting their employee from working for a competitor in a function other than those the employer actually engaged in. *See Home Paramount Pest Control Cos. v. Shaffer*, 282 Va. 412, 418, 718 S.E.2d 762, 765 (2011).

[6] Within dicta, one case in the Western District of Virginia has gone so far as to categorize covenants not to compete between partners in a professional firm under the less restrictive sale-of-business standard. *See Carucci*, 2011 WL 1706810, at *6. Though appealing at first blush, this Court does not read Virginia cases to establish such a demarcation. Both *Meissel* and *Foti* were analyzed under the employer/employee framework. *See W. Insulation*, 2006 WL 208590, at *6 ("Notably, the restrictive covenant in the *Meissel* case was analyzed under the heightened scrutiny context of an employment agreement."); *Foti*, 263 S.E.2d at 434 (noting its analysis of the "restrictive covenant[] in an employment contract" is controlled by the principles set forth in *Meissel*). In this Court's view, *Meissel* and *Foti* do not stand for the proposition that partners are judged under the sale-of-business standard. Rather, they stand for the longstanding proposition that within the employee/employer framework context matters. *See, e.g., Foti*, 263 S.E.2d at 433-34.

similar consideration, equal bargaining power, and sophistication—all factors, which individually and collectively weigh in favor of the covenant's reasonableness.

Two additional factors differentiate this case from the typical Virginia precedent. Neither concerns about the Defendants' ability to earn a livelihood nor public policy considerations favor voiding the Separation Agreement; indeed, both factors unequivocally support enforcement. Defendants concede the covenants do not impede their ability to earn a living.[7] Their concession is appropriate. Between the sale of North Fork and shares vested pursuant to the Separation Agreement, the Defendants received nearly $200 million. Such a sum is sufficient to mollify any concern that the Defendants' livelihoods would be affected by the covenant. *See W. Insulation*, 2006 WL 208590, at *7 n.6 (finding no undue hardship on the employees ability to earn a living where they are "multi-millionaires."). Moreover, the covenants did not, by any stretch, prohibit the Defendants from gainful employment. Three exceptions to the covenant were carved out at their behest. These exceptions permit the Defendants' potential employment with a private equity firm, investment bank, or hedge fund.

Public policy considerations also favor enforcement. Defendants point to Virginia's disfavor of non-compete clauses as restraints of trade to argue that Virginia's policy in favor of competition, "with all the benefits of lower prices and better services," renders the Separation Agreement unreasonable. *Morrison v. Mallory*, 1982 WL 215193, at *5 (Va. Cir. Apr. 22, 1982). More persuasive in this context is Virginia's public policy in favor of enforcing restrictive covenants "entered into and negotiated by sophisticated parties represented by counsel." *W. Insulation*, 2006 WL 208590, at *7 n.6. "[O]ne who is competent to serve as did this [executive]

---

[7] Once again, the Defendants expressly warranted as much within the Separation Agreement. Separation Agreement, Annex B ¶ 5 ("The Executive agrees that he will be able to earn a livelihood without violating Annex B, including, without limitation, the Non-Competition Covenant contained in paragraph 2(e) above.").

is supposed to understand and fully appreciate the significance of his engagements. While the law frowns upon unreasonable restrictions, it favors the enforcement of contracts intended to protect legitimate interests. It is as much a matter of public concern to see that valid engagements are observed as it is to frustrate oppressive ones." *Meissel*, 95 S.E.2d at 191 (quotations omitted).

Also paramount to the Court's policy considerations is the view of the employee at the time he entered into the covenant. "It is to be presumed that in that time and experience [the employee] was himself convinced that the restrictions he and his associates agreed on were reasonable and advisable." *Meissel*, 95 S.E.2d at 191. Such was the case here. Kanas and Bohlsen were unequivocal that, when executed, they viewed the Separation Agreement as mutual and binding. *See* Kanas Dep. at 89; Bohlsen Dep. 7. Indeed, several clauses within the Separation Agreement indicate as much.[8]

In such a scenario, sophisticated parties are entitled to the benefit of their bargain. To find otherwise would offend Virginia policy in favor of enforcing agreements by sophisticated parties who, at the time, viewed the agreements a reasonable and mutually binding. Furthermore, as Plaintiff noted during oral argument, voiding the contract would afford the Defendants a windfall. Defendants $42 million dollars in shares have already vested. Were the Court to void the agreement, Plaintiff would be left empty handed. The Court thus finds Capital One has met its burden of proving public policy considerations weigh in favor of finding the Separation Agreement reasonable.

The facts and circumstances of this case are without analogue—the Defendants' had no disadvantage in sophistication or bargaining power, they received sufficient consideration, and

---

[8] Separation Agreement, Annex B ¶ 5 ("The Executive further acknowledges that all of the restrictions in this Annex B are reasonable in all respects . . . ."); *id.*, Annex B ¶ 8 ("The parties have attempted to limit the Executive's right to compete only to the extent necessary to protect the Company's legitimate business interests. It is the intent of the parties that the provisions of Annex B shall be enforced to the fullest extent permissible under applicable law.").

neither concerns regarding their post-covenant ability to earn a livelihood nor considerations of public policy weigh in their favor. Because their individual circumstances and the Court's consideration of livelihood and public policy weigh against them, Defendants couch their argument in terms of the sole remaining factor: they maintain the Separation Agreement is void because it is not narrowly tailored to Capital One's legitimate business interests.

### B. The Separation Agreement is Narrowly Tailored to Capital One's Legitimate Business Interests; It is Reasonable in Duration, Geography, and Function and is not Voidable For Ambiguity or Overbreadth

When evaluating the reasonableness of covenants not to compete, Courts consider the geographic scope, duration, and function of the restriction in light of the employer's legitimate business interests.[9] *See, e.g., Home Paramount*, 718 S.E.2d at 763-64. "These elements are considered together rather than as three separate and distinct issues." *Id.* at 764 (quotations omitted). All three considerations fall within the bounds of covenants previously upheld by Virginia courts and are made all the more reasonable given the unique competitive threat posed by the Defendants and Capital One's legitimate business interest in restricting their ability to compete.[10]

### i. The Covenant Not To Compete is No Broader Than Necessary to Protect Capital One's Legitimate Business Interests

Before looking to the specifics of each factor, it is worth pausing to note the basis for Capital One's legitimate business interest in restricting the Defendants' ability to compete. The breadth of Capital One's legitimate business interest and the reasonableness of the covenant are

---

[9] Although courts consider these elements when evaluating the covenant's burden on the employee's livelihood, public policy, and narrow tailoring to the employer's legitimate business interests, Capital One has already met its burden on the issues of livelihood and public policy. The Court thus considers the duration, geography, and function of the restrictions in concert with their tailoring to Capital One's legitimate business interests.

[10] Once again, it bears repeating that the Defendants expressly covenanted that the Separation Agreement's restrictions were reasonable. *See* Separation Agreement, Annex B ¶ 5 ("The Executive further acknowledges that all of the restrictions in this Annex B are reasonable in all respects, including duration, territory, and scope of activity.")

two sides to the same coin. Capital One's broad and legitimate business interest in restricting the Defendants' ability to compete weighs in favor of the finding that the covenant is reasonable and enforceable. When John Kanas started North Fork, he went from being a school teacher to the president of a bank in approximately six years. Kanas Dep. at 13. Thirty years later, Capital One valued the goodwill of the bank Kanas and Bohlsen built, representing intangibles such as reputation, position in the community, and consumer relationships, at $9.7 billion. Bohlsen Dep. at 50. Both Kanas' meteoric rise and North Fork's longstanding success concerned Capital One, which had spent $13.2 billion to augment its position in the consumer and commercial banking industries—business lines outside Capital One's heritage as a national lending institution. Defendants had a proven ability to start from scratch and grow a bank from the ground up. Capital One feared the Defendants' ability to swiftly grow a bank into a formidable competitor. After all, they had done it before. This time, however, they would not start from scratch, but with thirty years of experience, which afforded the Defendants' a stellar reputation and longstanding personal relationships with numerous customers.

Virginia courts pay particular attention to employee's relationships with consumers when addressing an employer's legitimate business interests and, in turn, a particular covenant's reasonableness. "[N]on-competition agreements are also justified where the employee comes into personal contact with his employer's customers." *Blue Ridge Anesthesia and Critical Care, Inc. v. Gidick*, 239 Va. 369, 372, 389 S.E.2d 467, 469 (1990) (quotation omitted). While at Capital One, as they had during their thirty years with North Fork, the Defendants emphasized

personal relationships with their customers.[11] When an employee, "by leaving, threatens to siphon off the former employer's customers or goodwill, the law typically permits greater restrictions to be imposed by contract . . . ." 6 Williston on Contracts § 13:13 (4th ed.). Such was the concern here. The Defendants' abilities and customer relationships rendered them a unique competitive threat to Capital One. And Capital One attempted to protect its legitimate business interests by means of a non-compete agreement.

The Defendants' past success and sizeable goodwill were not the only basis that made them a formidable competitive threat. As Capital One employees and advisors, the Defendants obtained confidential information about Capital One's consumer and commercial banking business. When employees have access to confidential information, such access provides employers with a legitimate business interest in a restrictive covenant and renders covenants not to compete more reasonable. *See Comprehensive Techs. Int'l, Inc. v. Software Artisans, Inc.*, 3 F.3d 730, 739 (4th Cir. 1993), *vacated pursuant to settlement, see also Meissel*, 95 S.E.2d at 191 ("In testing the reasonableness of a restrictive covenant[,] possession of trade secrets and confidential information is an important consideration . . . ."); *Roanoke Eng'g Sales Co. v. Rosenbaum*, 223 Va. 548, 553, 290 S.E.2d 882, 885 (1982) (finding covenant enforceable when an employee had access to confidential information and such knowledge "qualified him to be a formidable competitor" to his previous employer). The Separation Agreement makes repeated reference to the Defendants' access to confidential information as a basis for the covenant not to compete. To be sure, as senior executives, the Defendants' access to confidential information was not limited to their own areas of responsibility. They acknowledged "because of [their]

---

[11] *See, e.g.*, Carter Dep. at 116 (describing Kanas' engagement "with the existing customer base" as a Capital One executive); Kanas Dep. at 30 (discussing the amount of time he spent with North Fork's "large customers in trying to encourage them to do business with us."); Bohlsen Dep. at 24 ("Q: Is it fair to say that, over time, you developed relationships with the large customers of North Fork Bank? A: Yes."); *id.* at 33 (describing how both Defendants "developed strong relationships with key customers" and "built a lot of goodwill in the Long Island community.").

senior position[s] at the Company and [their] broad exposure to the Company's Confidential

Information [they] ha[ve] performed services, and ha[ve] had and will have access to and be

exposed to Confidential Information directly concerning all [consumer and commercial banking

business] of the Company." Separation Agreement, Annex B ¶ 2(a). Such broad access to

confidential information within their own lines of business and *all* lines of the consumer and

commercial banking business engaged in by Capital One provided further support for the

reasonableness, if not necessity, behind the covenant not to compete.

In sum, the Defendants' combination of historic ability, present goodwill, and recent

access to confidential information provide overwhelming support for Capital One's contention

that it maintained a legitimate business interest in restricting the Defendants activities following

their departure from Capital One. Such a broad and legitimate interest weighs in favor of a

finding that the restrictions contained in the Separation Agreement were reasonable under the

circumstances.

      ii.      **The Covenants Are Reasonable in Geographic Scope and Duration**

Capital One specifically limited Defendants' non-compete to the Tri-State area, the same

market in which Defendants grew and operated North Fork for thirty years and then Capital

One's Banking Segment. Their knowledge of the Tri-State area's customers and competitive

landscape made them a unique competitive threat to Capital One's fledgling banking segment.

They grew a bank from nothing before, and, quite reasonably, Capital One believed they could

do so again. Such geographic scope that relates to the geographic area covered or serviced by the

employer has been upheld by Virginia courts and is reasonable here. *Roanoke Eng'g*, 290 S.E.2d

at 884-85; *see also Blue Ridge*, 389 S.E.2d at 470.[12] The five-year duration of the separation

agreement is similarly reasonable and within the bounds of Virginia precedent. *See Meissel*, 95

S.E.2d at 190; *Zuccari, Inc. v. Adams*, 1997 WL 1070565, at *3 (Va. Cir. Apr. 10, 1997)

(upholding a five-year restriction preventing an employee from soliciting or doing business with

the employer's current clients since the employee gained all his experience and contacts through

his former employment). In light of the significant competitive threat posed by the Defendants

and the guidance provided by previous Virginia cases, a covenant of five-year duration, limited

to the Tri-State area, is reasonable.

### iii.    The Covenants Are Reasonable in Function; Neither Ambiguity Nor Overbreadth Renders the Covenants Unenforceable

The Court's analysis of reasonable function goes hand in hand with its analysis of

overbreadth. Due to Virginia's requirement that covenants not to compete be narrowly tailored to

protect the employer's legitimate business interest, covenants that are functionally overbroad are

unreasonable and void as a matter of law. *See, e.g.*, *Omniplex*, 618 S.E.2d at 342-43; *Roanoke

Eng'g*, 290 S.E.2d at 885 (non-competition covenant reasonable because employment restriction

limited to activities similar to business conducted by the former employer). For its part,

ambiguity is another means to overbreadth. When the "noncompete clause is ambiguous and

susceptible to two or more differing interpretations, at least one of which is functionally

overbroad, the clause is unenforceable." *Landmark Tech. Inc. v. Canales*, 454 F. Supp. 2d 524,

531 (E.D. Va. 2006).

The Court begins its analysis of the Separation Agreement's function by reviewing its

plain language for ambiguity. In assessing the function of a covenant and any ambiguity, courts

---

[12] In fact, the geographic areas serviced by the Defendants during their time at Capital One were broader than the Tri-State area. *See* Bohlsen Dep. at 84; Finneran Dep. 308. Nonetheless, the Separation Agreement limited the non-compete provision's geographic scope to an area smaller than that "covered or serviced by the employer." *Roanoke Eng'g*, 290 S.E.2d at 884-85.

look first to the covenant itself. When the covenant's language is clear, the Court need not consider extrinsic evidence. *See Home Paramount*, 718 S.E.2d at 765 ("The argument that the scope of the function element could be altered by extrinsic and extraneous evidence to mean something [other] than its clear language is without merit.").[13] "A contract is not ambiguous simply because the parties to the contract disagree about the meaning of its language." *Pocahontas Mining Ltd. Liability Co. v. Jewell Ridge Coal Corp.*, 263 Va. 169, 173, 556 S.E.2d 769, 771 (2002). Indeed, in the context of a covenant not to compete, the covenant is only void for ambiguity if (1) susceptible to two or more differing interpretations, (2) one of which is overbroad. *Landmark*, 454 F. Supp. 2d at 531.

The Separation Agreement's language, particularly its prohibition of Defendants' ability to "engage in" a business competitive with Capital One, is unambiguous. The term "engage in" prohibits Defendants from taking "affirmative steps which go beyond the planning stage." 2 Callmann on Unfair Competition, Trademarks & Monopolies § 16:26 (4th ed. 2011) (quotation omitted). The very same language has been found unambiguous and enforceable by multiple Virginia courts. *See, e.g., Rash v. Hilb, Rogal & Hamilton Co.*, 251 Va. 281, 285, 467 S.E.2d 791, 794 (1996); *Knighton*, 419 S.E.2d at 26. Knowledgeable counsel negotiated and drafted the Separation Agreement and, quite frankly, it shows.[14] Though counsel may, in good faith, disagree about the import of particular provisions, no provision is subject to multiple

---

[13] In *Home Paramount*, the employer sought to introduce extraneous evidence to support its contention that the scope of the covenant was narrower than its clear language indicated. In this case, it is the employee who has put forth extraneous evidence to show the covenant is broader than its clear language indicates. Though the Court is required to construe its language broadly for overbreath analysis, the reasoning of the *Homes Paramount* court is equally applicable here. The Court finds the Separation Agreement's restrictions unambiguous, and recourse to parol evidence is unnecessary. *Home Paramount*, 718 S.E.2d at 765.

[14] The Separation Agreement as a whole reflects a sophisticated understanding of Virginia law on the subject. The agreement references legal standards, such as Capital One's "legitimate business interests," the Defendants' "ab[ility] to earn a livelihood," and the reasonableness of the covenant's restrictions both in general and with regard to "duration, territory, and scope." Separation Agreement, Annex B ¶ 5.

interpretations, one of which is overbroad. Consequently, ambiguity provides no basis for a finding of impermissible overbreadth.

Nor can the Court fault the Separation Agreement for overbreadth on another basis. Courts assess the "function element of provisions that restrict competition by determining whether the prohibited activity is of the same type as that actually engaged in by the former employer." *Home Paramount*, 718 S.E.2d at 764. Virginia courts focus their analysis on the activities engaged in by the former employer, not the former employee's specific role with his or her former company.[15] *See, e.g., id.*; *Omniplex*, 618 S.E.2d at 342; *Brainware*, 808 F. Supp. 2d at 826 ("Although the non-compete provision is not limited to those [of the Employer's] products on which [the employee] personally worked, this fact is not, as the defendant would have it, fatal to the contract."). The focus on the activities an employee performed for their former employer and those they are permitted to perform for a prospective employer, by contrast, come into play only in a scenario that is not present here. "When a former employer seeks to prohibit its former employees from working for its competitors *in any capacity*, it must prove a legitimate business interest for doing so." *Home Paramount*, 718 S.E.2d at 765 (emphasis added). The covenant at issue contains no such restriction. Rather, it limits its restrictions to "the consumer and commercial banking business" "engaged in" by Capital One "as of the Separation Date." Separation Agreement, Annex B ¶ (2)(b).

---

[15] Previously, certain courts formulated this rule differently to enforce non-competes "only to the extent that the [employee's] proscribed functions are the same functions as were performed for the former employer." *Cantol, Inc. v. McDaniel*, No. 2:06-cv86, 2006 WL 1213992, at *4 (E.D. Va. Apr. 28, 2006); *see also Nortec Comm'c, Inc. v. Lee-Llacer*, 548 F. Supp. 2d 226, 230 (E.D. Va. 2008) (quoting *Cantol*); *Landmark*, 454 F. Supp. 2d at 528 (same). The Virginia Supreme Court, whose decisions on issues of Virginia state law are binding upon this Court, recently reiterated it assesses functional scope by looking to the activities engaged in by the former employer, not the employee. "We have consistently assessed the function element of provisions that restrict competition by determining whether the prohibited activity is that *actually engaged in by the former employer*." *Home Paramount*, 718 S.E.2d at 764 (emphasis added); *see also Omniplex*, 618 S.E.2d at 342 (observing that valid provisions prohibit "an employee from engaging in activities that actually or potentially compete with the employee's former employer."); *see also Brainware, Inc. v. Mahan*, 808 F. Supp. 2d 820, 826 (E.D. Va. 2011).

The Separation Agreement's restrictions regarding "the consumer and commercial banking business engaged in by" Capital One is expressly permissible as a prohibition "of the same type [of activity] as that actually engaged in by" Capital One. *Id.*; *Home Paramount*, 718 S.E.2d at 764. Valid provisions prohibit "an employee from engaging in activities that actually or potentially compete with the employee's former employer," while invalid prohibitions go beyond the scope of the employer's business. *Omniplex*, 618 S.E.2d at 342; *see Simmons*, 544 S.E.2d at 678 (finding overbroad a covenant preventing an employer of a cigar company from "directly or indirectly," being employed by or connected "in any manner" to "any business *similar to* the type of business conducted by the employer," when the employer limited its business to importing a single, particular brand of cigars from the Canary Islands) (emphasis added); *Motion Control Sys. Inc. v. East*, 262 Va. 33, 37-38, 546 S.E.2d 424, 426 (2001) (voiding a covenant for overbreadth where it prohibited the employee from "directly or indirectly . . . be[ing] employed by . . . any business *similar to* the type of business conducted by" the former employer, namely the "design[], manufacture[], [sale] or distribut[ion of] motors, motor drives or controls" when the former employer dealt solely with specialized brushless motors). The Separation Agreement contains no similar overbreadth. It is undisputed that Capital One engages in "the consumer and commercial banking industry," which is the subject of the non-compete. Separation Agreement, Annex B ¶ (2)(b) (limiting its restrictions to "the consumer and commercial banking business engaged in by" Capital One). In contrast to the sweeping language found overbroad in *Simmons* and *Motion Control*, the Separation Agreement is clear and limited to Capital One's competitive business.[16]

---

[16] *Compare Home Paramount*, 718 S.E.2d at 765 (voiding covenant that barred its former employee "from engaging even indirectly, or concerning himself in any manner whatsoever, in the pest control business, even as a passive stockholder of a publically traded international conglomerate with a pest control subsidiary."), *with* Separation Agreement Annex B, ¶¶ 2(b),(e) (preventing the Defendants only from "engag[ing] in" "the consumer and

Invalid covenants also prevent employees from "working for its competitors in any capacity" without proving a legitimate business interest for doing so. *Home Paramount*, 718 S.E.2d at 765 (citing *Modern Env'ts*, 561 S.E.2d at 696). The covenant at issue contains no such restriction. The Separation Agreement provides exceptions that limit the scope of the covenant generally and specifically allow the Defendants to work for a competitor, so long as the Defendants do not provide services "to the portion of the [competitor's] business which is directly engaged in" the consumer and commercial banking business engaged in by Capital One. Separation Agreement, Annex B ¶¶ 2(b),(e). Because of this exception, Defendants are not prevented from working for a Capital One competitor in any capacity.[17] Moreover, if somehow, such a prohibition could be read to prevent the defendants from employment with a competitor in any capacity, it still would not prove fatal to the contract. Defendants put forth a legitimate business interest in restricting the defendants' activities beyond those they performed for Capital

commercial banking business engaged in by" Capital One and providing express exceptions for: i) owning equity securities of not more than 10% of *any* entity, ii) providing services to a competitor, so long as the executive does not provide services to the portion of the competitor that directly competes with Capital One, and iii) working for a private equity firm, hedge fund, or investment bank, so long as it does not involve advising the company with respect to Capital One).

[17] By way of example, this case is inapposite to *Roto-Die*, where the court found a covenant void for overbreadth because the covenant prohibited the employee from employment in a competitive business without exception. 899 F. Supp. at 1520. Without any functional limitation, the employee would be prohibited from employment in any capacity, even as a janitor, for a competitive business. *Id.* Here, by contrast, there is no question that should the Defendants so choose, they could provide janitorial services to a Capital One competitor. Such employment would fall under the covenant's exception that allows employment for a competitor "provided that the Executive is not providing services to the portion of the business which is directly engaged in" the consumer or commercial banking business. Separation Agreement, Annex B ¶ 2(e). Where, as here, the covenant provides an exception to the general covenant not to compete for employment for a competitor in a non-competitive role, Virginia courts find such covenants valid and enforceable. *See Blue Ridge*, 389 S.E.2d at 468 (upholding covenant that prevented the employee from "be[ing] employed by . . . any competitor of Employer which renders the same or similar services as Employer" when the covenant contained an exception allowing the employee to work for a competitor in a noncompetitive role).

One[18] and any slight overbreadth in terms of function is saved by the narrowly tailored geographic scope and duration.[19]

The careful language of the Separation Agreement is neither ambiguous nor overbroad. Like its geographic and temporal limitations, the Court finds the functional scope of the covenant reasonable.

## CONCLUSION

Months after the dust settled following the sale of North Fork to Capital One, the Defendants' preeminent counsel provided the first draft of an agreement that would govern John Kanas and John Bohlsen's separation from Capital One. Taking into account the Defendants' history of success within the consumer and commercial banking industries and their knowledge of Capital One's strategy for their nascent commercial and consumer banking business line, the parties agreed to reasonable restrictions upon the Defendants' ability to compete with Capital One. The Court will not void such a reasonable and limited covenant, agreed to by sophisticated parties for ample consideration. In such circumstances, the parties are entitled to the benefit of their bargain. The Court, therefore, finds the covenant enforceable and denies the Defendants' Motion for Summary Judgment to the extent it requests the Court void the Separation Agreement.

---

[18] The covenant at issue does not prohibit the Defendants from working for their competitors in any capacity. *See* Separation Agreement, Annex B ¶ 2(e). Even if it did, Capital One put forth a legitimate business interest for restricting the Defendants' activities beyond those they performed at Capital One. *See generally supra*, Part II(B)(i). Beyond the competitive threat posed by the Defendants and their interaction with customers, both expressly covenanted that they were "broadly expos[ed]" to confidential information directly concerning *all* of Capital One's consumer and commercial banking business, not simply confidential information from the business lines they oversaw. Separation Agreement, Annex B ¶ 2(a). In such a scenario, extending the functional scope of the covenants to include those businesses regarding which the Defendants received confidential information is entirely reasonable. *See Brainware*, 808 F. Supp. 2d at 826-27.

[19] Though the Court finds no overbreadth, the function element of a provision that restricts competition is weighed together with its geographic scope and duration elements. *See, e.g., Home Paramount*, 718 S.E.2d at 765; *Advanced Marine*, 501 S.E.2d at 155.

The Court takes the Defendants' alternative request for partial summary judgment regarding breach under advisement. It will be addressed in concert with Plaintiff's motion for partial summary judgment on the same issue. The Court also declines to rule upon the availability of disgorgement as a remedy at this time. Such a ruling is premature and will be addressed, if necessary, at an appropriate later stage of the litigation.

An appropriate Order will issue.

May 1 7, 2012
Alexandria, Virginia

/s/

Liam O'Grady
United States District Judge